David CARLISLE, Appellant,

v.

The STATE of Texas, Appellee.

No. 52046.

Court of Criminal Appeals of Texas.

March 9, 1977.

Rehearing Denied May 11, 1977.

Frank Maloney and Philip A. Nelson, Jr., on appeal, Austin, for appellant.

Jim D. Vollers, State's Atty., David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

BROWN, Commissioner.

This is an appeal from a conviction for murder. Appellant was tried before a jury which assessed his punishment at twenty-five (25) years in the Texas Department of Corrections.

Appellant challenges the sufficiency of the evidence in his first ground of error. The deceased, Betty Ann Carlisle, was the appellant's former wife. It appears from the record that the couple was attempting a reconciliation at the time of this murder.

The body of the deceased was discovered at approximately noon on August 1, 1974. Ronnie Anson testified that he found the body sitting in the front seat of a 1974 Pontiac Grand Prix, later shown to belong to appellant. The car was parked in a vacant lot near a store known as Bob's TV Shop. Anson said that after he discovered the body he called his brother Bob, owner of the shop. The sheriff was summoned and both Anson and his brother testified that they were present when the sheriff began his investigation. They discovered several empty beer cans and an unopened bottle of whiskey on the floor of the car. They also found the deceased's purse and stated that there was a considerable amount of money stuck in the compartments of the purse. Also found in the purse and in the glove compartment of the car were several bottles containing various types of pills. Both men also described an area which they said the sheriff referred to as a "struggle area" some twenty or thirty feet from the car. It appears that the ground surrounding the car was muddy from rain at an undetermined time and many footprints appeared in the damp caliche soil. The so called "Struggle area" appeared to have a number of footprints in an irregular pattern as if someone had struggled or staggered around. Also scattered around the struggle area was about fifty dollars in bills of various denominations.

Two witnesses stated that they saw a car parked near Bob's TV in the early morning hours of August 1. G. T. Watkins stated that he passed the shop at 7:00 a. m. and saw the Grand Prix and another car which was parked in front of the shop. He said that he circled the area and drove near the Grand Prix and saw someone who appeared to be asleep in the driver's seat of the car. He learned of the killing later that day. Mrs. Verna Richardson testified that she passed the shop between 5:30 and 6:00 a. m. on August 1 and saw the Grand Prix parked in a slightly different position than that described by the other witnesses. She also stated that both doors of the car were open and the dome light was on. She further stated that she saw another car parked in front of the shop. She said that this car was a Mustang, but could not describe the color. Bob Anson testified that he also saw the Mustang and that its owner came into his shop during the morning before the discovery of the deceased and apologized for blocking his parking area. He stated that the man was of Mexican descent and that he "jump-started" the Mustang and left. Mrs. Richardson's son and daughter-in-law both testified that they lived within a block of the shop and that they were awakened at approximately 5:30 or 6:00 a. m. by a loud noise which was described as similar to an aerosol spray can popping.

Leon Gorrell, deputy sheriff of Deaf Smith County, stated that he saw the deceased in the company of appellant and another woman at Big Daddy's Cafe near Hereford on the night of July 31–August 1. He said that he spoke with the deceased and that she left with appellant at about 2:00 a. m., August 1. Peggy Adams, a waitress at Big Daddy's, testified that she also saw appellant and the deceased together in the cafe on the night in question. She said that she spoke with the couple and that everything seemed to be all right. There was no evidence of disagreement between them. She said that they left in appellant's car at about 3:00 a. m. She further stated that she had heard that appellant and the deceased were getting married again and

that she had seen the deceased getting pills from truck drivers on several occasions and had seen her take "white glossies" or "uppers" on several occasions.

Dr. Jose Dias-Esquivel, the physician who performed the autopsy on the deceased, testified that he discovered a bullet wound through the right arm passing into the chest under the right breast, penetrating the right lung, the pericardium and left lung and lodging in tissue under the left breast. He stated that a second bullet entered just under the first wound, followed a similar path through both lungs and also lodged in tissue under the left breast. A third bullet entered through the right shoulder, passed through the right lung and lodged in the second thoracic vertebra. Dr. Dias also stated that there were four more wounds on the body which he believed were caused by two more bullets passing completely through the body from front to back. On cross-examination it was developed that the chemist who examined the clothing of the deceased was of the opinion that these last two bullets entered from the back and exited through the front of the body. Dr. Dias stated that his tests were not positively conclusive about the path of those bullets. He also testified that he found no evidence of drugs or alcohol in the body of the deceased. Time of death was not positively shown. Dr. Dias estimated time of death at six to eight hours prior to his examination, which took place on the morning of August 2. However, he qualified this opinion by stating that if the body had been embalmed (he did not remember if it had) then death would have taken place six to eight hours prior to embalming. It was later shown that the body had been embalmed on the afternoon after it was discovered.

An attendant at a Phillips 66 service station located within a block of Bob's TV shop testified that he saw a man in the telephone booth on the corner near the station sometime between 7:30 and 9:00 a. m. on the day the deceased was discovered. He stated that the man stood in the booth for over an hour and possibly as long as two hours.

The manager of the sporting goods department of a Gibson's Discount Center in Plainview testified that he sold appellant a .38 caliber pistol on July 23, 1976. The pistol was found by Deputy Sheriff Henry Minter in a ditch near Bob's TV on the afternoon of August 1.

Minter testified that he participated in the investigation and observed caliche mud on the inside of the car on the front seat, on the console and on the back seat. He said that the deceased had no mud on her clothes or boots. He also observed the boot tracks and the "struggle area." He further stated that he observed another area just outside the passenger door of the car where it appeared that someone had fallen down in a mud puddle. He stated that there was the imprint of a shirt and buttons in the caliche in this area. He stated that the boot tracks appeared to go around the car to the driver's door and that there was a muddy hand print on the driver's door. He stated that he followed the boot tracks to the "struggle area" and away from the scene to the Phillips 66 station and that the attendant told him about the man in the telephone booth. He examined the booth and found several pills scattered on the floor of the booth. He later returned to the scene and followed the boot tracks in another direction toward an old wrecked car nearby and found another muddy hand print on that car. He stated that he followed these tracks into a ditch where he found a billfold containing appellant's identification cards and a $100 bill and a $1 bill. A few feet further he found the pistol. Minter testified that in his opinion all of the boot tracks were made by the same pair of boots.

Deputy Sheriff Tom Atkins testified that he went to the scene of the investigation with Minter and that he was ordered to return to the sheriff's office to retrieve a camera. When he arrived at the office he was met by appellant's father. Atkins said that he went outside to a car where appellant was sitting with his brother. Appellant got out of the car and went inside with his father and Atkins. Atkins stated that

appellant appeared to be unsteady and that he seemed very woozy as though he were drunk or on pills. He said that appellant had mud on his clothes and boots. Atkins said that he summoned a doctor at the request of appellant's father and that the doctor arrived within a few minutes and examined appellant. Atkins said that appellant's father told him that appellant had picked up a hitchhiker and had been hijacked. He said that the sheriff arrived shortly thereafter and following a brief discussion with appellant and his father, he placed appellant under arrest. Atkins said that appellant had two $100 bills and one $1 bill in his possession at the time of his arrest. Atkins also said that he later participated in a thorough examination of the car and that no bullet holes were found in the car.

Sheriff Charles Lovelace testified that he found five empty Coors beer cans and one full can on the floor of the car as well as an unopened pint of liquor. He also stated that there was a considerable amount of caliche mud on the front seat and floor and on the console and back seat of the car. He also expressed the opinion that all of the boot tracks around the car were made by one person. Furthermore, since the deceased had no mud on her boots, he concluded that she was shot while sitting in the car. He further stated that in addition to the beer cans, liquor and pills in the car, he recovered a zippered bank bag containing ten live .38 caliber shells. He also found a suitcase full of men's clothing in the car and a pair of swimming trunks on the ground just under the left side of the car. He said that he spoke with appellant that afternoon and that he seemed to be "coming off a drunk." He stated that he took one of appellant's boots and placed it in one of the tracks at the scene and that it matched in length, width and heel. He said that he made plaster casts of several of the tracks and that he thought the design which appeared on the heel of appellant's boot matched one of the plaster casts.

A chemist from the Department of Public Safety testified that he examined the victim's clothing and determined that the two bullet holes in the back of her blouse were entrance holes. However, he further stated that he found a total of five holes in the blouse, which would seem to conflict with the testimony of the pathologist who stated that he found three bullets in the body and four other wounds which were made by two bullets passing through the body, for a total of seven wounds. The chemist further stated that he analyzed samples of the pills found in the car and found that some of them contained amphetamines while others contained barbiturates and others contained no controlled substance. He also stated that he found human blood on the pistol, the zippered bank bag, and appellant's trousers. No finger prints were found on the weapon.

Appellant's brother and father both testified that they drove from Hereford to Farwell in response to appellant's phone call and found him in the phone booth at noon on August 1. They both stated that he appeared dazed and woozy and unsteady on his feet and that his speech was nearly incoherent. They said that he had mud on his clothes and boots and that he was bleeding from a cut on his forehead.

Appellant's sister testified that she spoke with him on the telephone and that he said that he was in a phone booth. She said that he told her that Betty Ann (the deceased) had been hurt, that they were on their way to get married and had stopped to pick up a hitchhiker. She said that his speech was slurred and that he was not making complete sentences, but rather skipped around in trying to tell her what happened. She understood appellant to say the hitchhiker had pulled a gun on him and made him get in the back seat of the car. He then asked appellant if he had any pills and appellant gave him a bottle of Valium, which the hitchhiker forced him to take. Appellant told his sister that the hitchhiker threatened to kill him if he did not take the pills, so he took them and washed them down with a beer.

The doctor who examined appellant at the sheriff's office testified that appellant

appeared to be drugged and that he told him that he had been forced to take Valium tablets. He stated that appellant had several bruises and abrasions on his head. It was later developed that the doctor was wearing shoes with a boot-type heel and that he was at the scene of the investigation and stepped in one of the tracks which the sheriff had circled.

The director of the Major Crime and Narcotic Control Unit of Hale County testified that on July 20, 1976 appellant came to talk with him about his ex-wife (the deceased). He stated that appellant wanted to know if he was acquainted with the deceased and that he was worried that she was involved with the sale or distribution of pills from her job at Big Daddy's Cafe.

Appellant testified in his own behalf and stated that he did not kill his wife. He said that he picked her up early in the evening of July 31 and that they went to Big Daddy's and were there until after 1:00 a. m. He said they left the cafe and drove around and the deceased asked if she could drive his new car, so they switched places. He said they drove around for a while longer and he drank a beer and they talked about getting remarried. He said they decided to get married and continued driving toward Plainview to get some of his clothes from his home. As they were driving to Plainview the deceased pulled to the side of the road to pick up a hitchhiker because it was raining and she felt sorry for him. Appellant described him only as "a white man." The stranger told them he was going to Amarillo and so they proceeded to a small town where they were going to turn to continue toward Plainview. Appellant said that he told the hitchhiker he would probably want to get out there to catch a ride on to Amarillo and he replied that he would be going on with them. Appellant said that this startled him and he turned around and the man was holding a gun on him. He said that the deceased asked what was going on and the man told them to do as he said or he would kill them. Appellant said that he asked if they had any pills and that he got a bottle of Valium which the de-

ceased had given him and gave it to the stranger. He said that the man then ordered him to take the pills and drink several beers. Appellant stated that from this point on his memory of the events becomes very hazy because the pills took effect. He vaguely remembered being asked for the keys to his house and said that this is when the suitcase was packed. The next thing he remembered was waking up to loud noises and finding himself on the floor of the car. He said that he fell out of the car and grabbed at someone and was hit over the head and that he heard the deceased crying for help. It was developed during appellant's testimony that the time span from the time the hitchhiker was picked up until he pulled the gun and ordered appellant to take the pills was no more than fifteen minutes, by appellant's own estimate. Appellant was not able to state whether the gun the man pulled was appellant's .38 caliber pistol, which was kept in a zippered bank bag under the seat, or the stranger's own weapon.

The court charged the jury on the law of circumstantial evidence and intoxication. Appellant contends that the circumstantial evidence does not exclude every other reasonable hypothesis except his own guilt.

Reliance is had upon *Kitchens v. State,* 145 Tex.Cr.R. 272, 167 S.W.2d 762 (1943), an arson case in which the State relied on circumstantial evidence. The evidence reflected that the accused had shown malice toward the oil company whose tanks were set on fire. Footprints were found leading from the defendant's house to the nearby oil tanks and back toward his house. The defendant's feet fit into those tracks. It was shown that the arsonist used pieces of string, cheese cloth, clothes pins and matches to set the fire. The officers found similar string in the defendant's possession, similar cheese cloth and clothes pins on his clothes line, and similar matches in his pocket. The defendant's wife testified that he came home drunk at about 11:30 p. m. and she put him to bed and he was in bed when the tanks exploded after midnight. We held the evidence insufficient, saying

that even though the evidence showed that someone from the defendant's home may have destroyed the tanks, it was not shown that the defendant and his wife were the only ones there during the time the fire was set.

Although the *Kitchens* case contains some analogous circumstances, we recognize and apply the rule that every circumstantial evidence case must be tested by its own facts to determine the sufficiency of the evidence. *Indo v. State,* 502 S.W.2d 166 (Tex.Cr.App.1973); *Baker v. State,* 447 S.W.2d 172 (Tex.Cr.App.1969).

We have held in a long line of cases that a conviction on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the accused, and proof amounting only to a strong suspicion or mere probability is insufficient. *Indo v. State, supra; Flores v. State,* 489 S.W.2d 901 (Tex.Cr.App.1973). The jury in a circumstantial evidence case is authorized to accept or reject any or all testimony of any witness and they may look to all the evidence offered by the State as well as that offered by the appellant. *Angle v. State,* 486 S.W.2d 308 (Tex.Cr.App.1972); *Indo v. State, supra.*

The fact situation of *Indo v. State, supra,* is instructive. There the accused summoned authorities to his home and stated that a burglar had broken in and shot his parents and that he had returned fire. The evidence showed that the parents were killed by several shots from a .22 caliber weapon. The accused was in possession of a .22 rifle at the scene and the clip contained six live rounds, but was designed to hold eleven or twelve rounds. Officers found six .22 caliber hulls in various locations throughout the house. We held the evidence sufficient, stating that "only appellant's testimony raised the possibility that some unidentified burglar may have shot his (parents)", but "we have but to point to a few of the discrepancies in his testimony which the jury may have observed."

In the instant case the jury heard only appellant's testimony that an unknown hitchhiker was involved in this murder. He was corroborated at trial by his sister and father who could testify only to what he told them. Appellant asks us to believe his solitary story that he and his ex-wife decided to remarry; that they decided to go to *his* home and get *his* clothes prior to the nuptials and that the bride-to-be expressed no desire to obtain any other clothing; that on the way to get married they stopped to pick up a hitchhiker who within minutes pulled a gun and made the bizarre demand that appellant take an overdose of tranquilizers; that this hijacker then ordered the couple to proceed to appellant's home to get his suitcase packed; that he then shot the deceased and left her and the appellant in a new car in possession of more than three hundred dollars in cash; that he took appellant's wallet with an additional hundred dollars and threw it in the weeds along with the murder weapon and disappeared without leaving a trace of his presence. Such a story presented to the jury only by the appellant strains credulity.

Viewing the record in the light most favorable to the State, we find that the evidence, as presented to the jury, is sufficient to support the verdict. *Indo v. State, supra; Brown v. State,* 475 S.W.2d 938 (Tex. Cr.App.1972).

In his second ground of error appellant contends that the trial court erred in overruling his motion for new trial on grounds of newly-discovered evidence which tends to corroborate his hitchhiker theory.

At the hearing on the motion for new trial appellant presented the testimony of Willard Clinton Wright. Wright was acquainted with appellant through his uncle Clifford Carlisle. He stated that appellant and his uncle had come to his place of business one day to inquire about some horses and that he met appellant and saw his new Pontiac which appellant was showing off. Wright stated that he knew nothing of appellant's arrest or trial except that Clifford mentioned something about having to go to court for his nephew. Appellant's

trial concluded on April 25, 1975 and it was not until May 8 that Wright again spoke with Clifford Carlisle when he went to Carlisle's place to work on a horse. Wright said he asked appellant's uncle "how he come along in court," and that he was then informed of the nature of appellant's trial and circumstances surrounding the crime. Wright then mentioned to Clifford that he had seen appellant's car being driven on a highway near Plainview late at night several months prior to May 8. Neither man thought seriously about the incident at that point, but Wright said that later in the week appellant's father called him to ask if he could remember more details and the date that he had seen the car on the highway. He stated he remembered that on the night he saw appellant's car he was trying to round up some cattle that had strayed onto the highway from land he owned near Plainview. He said that as he was trying to round up the cattle a car pulled up and stopped in the highway to avoid hitting the animals. A man got out of the passenger door of the car and stood by the car while Wright finished gathering the cattle. Wright said that he approached the car to thank the man for waiting and that he recognized the car as appellant's. He knew the man was not appellant and he said that when the man opened the door of the car he recognized appellant's wife, the deceased, driving the car. He said that he spoke with her and asked if she was Betty Carlisle and she replied that she was. He then asked her where appellant was and she replied that he was asleep or passed out in the back seat. Wright said that he looked in the back seat and saw a pair of boots and someone lying down in the seat. Wright said that he thought nothing of the incident at the time because it was very late at night, later than 3:00 a. m. It was developed that Wright could pinpoint August 1, 1974 as the date of this incident. He was able to do so because on the previous day, July 31, he had filed an insurance claim for a hog that had been run over on a highway near another piece of property. Wright said that he knew the date was correct because on the same day the hog was killed

he moved the cattle onto his property and they strayed onto the highway late that night. The insurance claim form reflects the July 31, 1974 date.

We note that appellant responded to the State's evidence impeaching Wright's credibility with competent rebuttal testimony.

■ The trial court has considerable discretion in granting or denying a new trial on the basis of newly-discovered evidence. To show that the court abused its discretion by not granting a new trial, the record must reflect: (1) that the evidence was unknown to the movant before trial; (2) that the failure to discover it was not due to appellant's want of diligence; (3) that its materiality was such as would probably bring about a different result on another trial, and (4) that it was competent, not merely cumulative, corroborative, collateral or impeaching. *Hernandez v. State,* 507 S.W.2d 209 (Tex.Cr.App.1974); *Myers v. State,* 527 S.W.2d 307 (Tex.Cr.App.1975).

■ Appellant presented evidence that Wright's testimony was discovered by coincidence and would not have been discovered but for his conversation with appellant's uncle. Furthermore, the trial court specifically found that there was no lack of diligence. It was the opinion of the trial court that the evidence was merely cumulative and on that basis he overruled the motion for new trial. After reviewing all the testimony at the hearing on the motion for new trial, we agree with the trial court that appellant satisfied the first two requirements listed above. Therefore, the only issue before us is whether Wright's testimony would have affected the jury's verdict and would "probably bring about a different result on another trial."

Since appellant had already testified as to the presence of a third party in the car on the night in question, and Wright's testimony corroborates that fact, the State maintains that his testimony presents nothing new and is merely cumulative. Wright's testimony is corroborative of the fact that a third party was present in the car, but it also establishes facts which appellant could

not have known about because he was passed out in the back seat. However, the determining factor for our consideration is the effect such evidence would have on the jury in light of all the other evidence presented.

In holding above that the evidence, as presented to the jury, was sufficient to sustain the verdict of guilty, we found that it was the incredible nature of appellant's story that made his testimony so unbelievable in the face of the many incriminating circumstances brought out during the trial. It is the incredible nature of appellant's story, however, which makes Wright's testimony so very significant. We are unable to state categorically that the jury would have reached the same verdict if Wright had testified in their presence. Corroboration of appellant's testimony would certainly have affected their deliberations and might possibly have resulted in a different verdict, especially when such testimony is considered in combination with the conflicting testimony concerning the bullet wounds in the victim, her position and the absence of mud on her clothing, the lack of fingerprint evidence connecting appellant with the murder weapon, and the fact that it was not established at what time during the night it rained in Farwell to soften the ground around the car.

We find, therefore, that under the peculiar facts and circumstances of this case the trial court abused its discretion in overruling appellant's motion for new trial. See *Butler v. State,* 165 Tex.Cr.R. 30, 302 S.W.2d 142 (1957) and compare *Cole v. State,* 474 S.W.2d 696 (Tex.Cr.App.1971). In so doing, we reiterate that errors relating to newly-discovered evidence will be considered on a case by case basis and there must be strict compliance with all four of the requirements enumerated above.

The judgment is reversed and the cause remanded.

Opinion approved by the Court.

DOUGLAS, Judge, dissenting.

The majority erroneously reverses the conviction and holds that the trial court abused its discretion in overruling appellant's motion for new trial on the grounds of newly discovered evidence.

Willard Clinton Wright testified on behalf of appellant at the hearing on the motion for new trial. He stated that he saw appellant's automobile near Plainview at approximately 3:00 a. m. on the morning of the murder. He further testified that the deceased was driving the automobile and a stranger was sitting on the passenger side of the front seat. Wright related that he saw someone lying in the back seat. The deceased told him that appellant was either asleep or passed out in the back seat.

Wright testified that the man in the car did not appear to be nervous. Wright related that he was getting some cattle off of the highway when the car stopped and he thanked the people for stopping and not hitting the cattle. The only thing he could remember about the man in the car was that he was medium sized. He could not give a further description.

The State presented testimony that Wright's reputation for truth and veracity was bad. Appellant responded with rebuttal testimony. The trial judge heard the witnesses. He was in a better position to pass upon their credibility than this Court is.

The majority correctly states that the trial court has "considerable discretion" in granting or denying a new trial on the basis of newly discovered evidence. In order for a new trial to be granted on such basis, it must be shown (1) that the evidence was unknown to the movant before trial; (2) that the failure to discover it was not due to movant's lack of diligence; (3) that it was competent, not merely cumulative, corroborative, collateral or impeaching; and (4) that its materiality was such as would probably bring about a different result on another trial. *Myers v. State,* 527 S.W.2d 307 (Tex.Cr.App.1975); *Henson v. State,* 74 Tex.Cr.R. 277, 168 S.W. 89 (1914).

Testimony was introduced that Wright's testimony was unknown to him before trial

and the court found that there was no lack of diligence.

The majority is correct in writing ". . . the determining factor for our consideration is the effect such evidence would have on the jury in light of all the other evidence presented."

An examination of the other evidence reveals that the deceased and appellant were seen together in a Hereford cafe on the morning of the crime. At approximately 3:00 a. m., they left the cafe, located about thirty miles from the scene where the deceased's body was found.

Between 5:30 and 6:00 a. m. that morning a couple residing in Farwell was awakened by a loud noise which was similar to an aerosol spray can popping. They lived behind Bob's TV Shop.

A woman observed appellant's automobile in a vacant lot near the television shop between 5:30 and 6:00 a. m. She testified that both doors were open and the automobile's dome light was on. Another witness observed the vehicle in the same location at 7:00 a. m. and saw someone who appeared to be asleep in the car.

The deceased's body was discovered in the automobile at noon. She had been shot five times, apparently with a .38 caliber pistol. A deputy sheriff and other investigators found blood in the automobile at the right side of the driver's seat. The ground surrounding the car was muddy. It had rained in Farwell the night before the homicide and the track of appellant's automobile showed that it had skidded on the right side near the mud puddle which was wetter than the other ground around there. The investigators discovered caliche mud, apparently from the vacant lot, inside the car on the front seat, on the console, and on the back seat. It is apparent that the deceased was killed at this location in Farwell.

The testimony of the witness on motion for new trial that there was a hitchhiker at another place had nothing to do with the physical facts where the body was found. Only one set of tracks, appellant's, was found at the scene.

A zippered bank bag owned by appellant and containing ten live .38 caliber shells was recovered from the vehicle. Several empty beer cans, various bottles of pills, the deceased's purse and wallet were also found inside the car. The wallet contained $166.00 in cash.

The investigators discovered a set of boot tracks that appeared to go from the passenger door around the car to the driver's door. The tracks then appeared to go back to the passenger's side and to a Phillips 66 station located nearby. After the crime, appellant had walked to that station and made several calls from a telephone booth there. He was first observed in the telephone booth between 7:30 and 9:00 a. m. Several pills were found on the floor of the booth.

The tracks also led away from the car in another direction. The deputy sheriff followed these toward an old wrecked car nearby. The tracks then led into a ditch where appellant's wallet was found. It contained $101.00 in cash. A .38 caliber pistol containing five empty shells lay a few feet away. Appellant had purchased the pistol only eight days earlier.

The boot tracks were made by one person. Appellant's boots matched those tracks. A Department of Public Safety chemist found blood on appellant's trousers, pistol and bank bag.

Appellant testified that he did not shoot the deceased; that he and the deceased picked up an unknown hitchhiker while they were going to get married; that the hitchhiker forced appellant to take a combination of drugs and alcohol which rendered him unconscious; that the hitchhiker shot the deceased and vanished without leaving a trace of his presence; and that the "hitchhiker" did not take a substantial amount of cash, if any, from appellant or the deceased. The hearsay testimony given by appellant's father and sister concerning what appellant told them after the murder is without probative value. See *Hanna v. State,* Tex.Cr. App., 546 S.W.2d 318 (1977); *Ex parte Martinez,* 530 S.W.2d 578 (Tex.Cr.App.1975).

The physical evidence surrounding the crime indicates appellant's guilt. From the

record it is improbable that Wright's testimony would produce a different result in the event of another trial. There is no showing that the trial judge abused his discretion in implicitly finding that a different result was unlikely.

The majority's reasoning is unsound. It asserts, on the one hand, that the nature of appellant's story is "incredible" and "bizarre." On the other, it holds that the trial judge abused his admittedly "considerable discretion" in overruling the motion for new trial based on appellant's self-serving version of the facts and supported only in a small degree by not a midnight but a three a. m. cowboy. The judge no doubt thought that the jury would not believe such testimony, and if it did, no different result would be reached in another trial.

This is not a case where the trial court refused to admit testimony offered during the trial. The proffered testimony came from a man who just happened to be looking for some livestock on a road at three o'clock in the morning many miles from where the body was found in appellant's automobile. It does not corroborate appellant's bizarre story of how the murder was committed. The majority should require more than such flimsy evidence to reverse a conviction because the court did not grant a new trial. Before this witness appeared the trial had been completed. Many witnesses testified. The statement of facts consists of more than a thousand pages. The record concerning the motion for discovery and the voir dire examination consist of 320 pages. All of this should not have to be repeated.

There is no abuse of discretion shown on the part of the trial judge in refusing to grant a new trial. The judgment should be affirmed.