

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| LAURA CARSNER, | § | No. 08-11-00326-CR |
| Appellant, | § | |
| | § | Appeal from the |
| v. | § | 171st District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20090D05416) |
| | § | |

**O P I N I O N**

Appellant, Laura Carsner, presents two issues on appeal from her conviction for capital murder.

**BACKGROUND**

A jury found Appellant guilty of capital murder for killing both her mother, Irma Quiroz, and her stepfather, Javier Quiroz, on August 29, 2009, and she was sentenced to a term of life imprisonment without the possibility of parole.

At trial, evidence was presented that Irma had filed a formal complaint to Child Protective Services (CPS) alleging Appellant had physically abused, neglected, or could not care for Appellant's daughter, Andrea, due to Appellant's alcoholism and heavy drinking. Appellant initially informed CPS that Javier had molested her as a child and requested that Andrea not be

placed with the Quirozes. Eventually, Appellant checked herself into a residential treatment facility and Andrea was permitted to live there with Appellant. Andrea was subsequently removed from the facility by CPS. According to Appellant, she was not permitted to visit Andrea thereafter. In May 2009, Appellant moved to Austin with the intent of reestablishing her chiropractic clinic there.

Court hearings to resolve the CPS matter were held in July 2009, and again on August 28, 2009, the day before the Quirozes were killed. Appellant returned from Austin to attend these hearings, which was the only way she learned of Andrea's progress. Appellant was unaware of where Andrea had been placed but believed both that Andrea had been placed in foster care and that any visits Andrea had with the Quirozes had been supervised.

At the first hearing in July 2009, Appellant was concerned that her parental rights would be terminated even though CPS had ruled out Appellant's alleged abuse of Andrea after determining that Andrea did not have any bruises, marks, or injuries. However, at the hearing on August 28, 2009, at which Appellant sought to ask the court to bar the Quirozes from weekend visitation with Andrea and was hopeful that the CPS case would be transferred to Austin, Appellant first learned that some of Andrea's visits with the Quirozes had been unsupervised. Appellant begged the judge to bar the Quirozes from unsupervised visitation with Andrea, revealed to the court that Javier had sexually molested Appellant for years as a child, and maintained that she had advised CPS of this fact.

Evidence from the August hearing showed that this was the first case for Ms. Hardin, the court-appointed special advocate (CASA) who, although knowing of Appellant's allegation of sexual abuse and without ever having interviewed the Quirozes, recommended that Andrea

2

continue visits with them.[1]   When asked whether it was appropriate for Andrea to have unsupervised visits with the Quirozes, even though the sexual assault allegation had been made, Hardin answered, "This is my first time in court. . . . I am going to say, yes," and noted that no outcry had been made directly to her.   Hardin conceded that she had no knowledge of whether Andrea was having unsupervised contact with Javier, that she had not interviewed the Quirozes, but continued to express that she had no concerns about Javier.   Hardin also testified that she was aware that Andrea had made an outcry of sexual abuse, but because Andrea had not made an outcry directly to her, Hardin had no concerns about placing Andrea with Javier despite Appellant's assertion that he had sexually abused her as a child.   Hardin stated that, despite Appellant's assertions, she did not have any concerns, but conceded that she had not interviewed Appellant.   Hardin admitted that she had heard at the hearing testimony that Andrea had made an allegation of sexual abuse against one of her cousins, and stated that although that was a concern of hers, she continued to recommend unsupervised visits with the Quirozes, even while acknowledging that Andrea's visits with her cousin had been at the Quirozes' home.

Appellant first learned of Andrea's sexual abuse outcry against her cousin during the August hearing.   She also learned that Andrea had reported to another foster child that she had been raped by her "boyfriend."   This terrified Appellant because Javier had made Appellant call him her "boyfriend."

Although CPS had not yet arranged for Andrea to be evaluated by a psychologist or examined by a psychiatrist, it had ruled out Andrea's sexual abuse outcries without investigating Javier.   At the conclusion of the hearing, the CPS caseworker recommended that unsupervised

---

[1] The transcript of the August hearing was admitted into evidence, and portions of the hearings were read during direct examination of Appellant.

visits with the Quiroz family continue and that Appellant be denied access to Andrea.

Appellant's friend of twenty-five years, Claudia, called Appellant on August 29, 2009, the day after the hearing, to find out what had happened. Claudia had been aware of Appellant's fear that Irma Quiroz would obtain custody of Andrea from Appellant, and described Appellant as being "beside herself" after the hearing. Claudia learned that "custody" had gone to Irma, that Appellant felt helpless, stated that she was going to "eliminate the situation," and wanted to remove Andrea from the Quirozes' care.

That day, Appellant drove to the Quirozes' home, armed with a gun, for the asserted purpose of removing Andrea from the Quirozes and taking her to police to report Javier's sexual assaults upon Appellant and Andrea, to a physician for a medical examination, and to have someone help Andrea. Appellant approached the Quirozes in their backyard, and testified that she told them that she had come to take Andrea to the police station. According to Appellant, both Irma and Javier rushed towards her and "[t]he gun went off," striking Javier four times and Irma eight times, and killing them. Appellant testified that she did not go to the Quirozes' home with the intent of killing them, and did not mean to kill the Quirozes, but feared that the Quirozes would take the gun away from her because they knew she was going to the police, and feared also for Andrea's and her own safety.

During its closing argument, the State argued that Appellant had not directed any claims of sexual molestation against Javier until Irma reported Appellant to CPS, and that Appellant's claims should be viewed with skepticism. The State advised the jury to not think that if Appellant had been abused, she was entitled to commit murder. The State also contended that Appellant did not act in self-defense, that Appellant had never informed anyone before trial that she acted in

4

self-defense, and asked the jury to consider whether the evidence was "manufactured for [Appellant's] defense . . . ."

In its charge, the trial court instructed the jury regarding the offense of capital murder as well as the lesser-included offenses of manslaughter and criminally-negligent homicide, but overruled Appellant's objection to the omission of an instruction on self-defense.

After being convicted of capital murder and sentenced to confinement for life without the possibility of parole, Appellant filed a motion for new trial in which she claimed that material evidence favorable to her had been discovered since trial "such that there is a reasonable probability that it would bring about a different result in another trial" and that "[the] evidence is admissible and not merely cumulative, corroborative, collateral or impeaching." After conducting a hearing, the trial court denied Appellant's motion for new trial.

## DISCUSSION

### *Motion for New Trial*

In Issue One, Appellant complains that the trial court abused its discretion in denying her motion for new trial because, more than being merely cumulative or corroborative, Appellant's post-trial, newly-discovered evidence would have overcome the State's suggestion that Appellant's claims of sexual abuse by Quiroz had been recently fabricated and was absolutely critical to the success of her defensive strategy regarding her mental state at the time of the killings.

At the motion for new trial hearing, Appellant presented evidence that after she was sentenced, Henry O'Hara read a newspaper article regarding Appellant's conviction which indicated that she had been convicted after the district attorney had persuaded the jury that Appellant's assertion of childhood sexual abuse was recently fabricated. O'Hara had dated

5

Appellant thirty years earlier, while Appellant was in high school. Their relationship ended after Appellant declined to engage in a more physically-intimate relationship. According to O'Hara, Appellant had informed him that the thought of physical intimacy with a man was frightening to her because she had been sexually molested by Appellant's stepfather or grandfather. O'Hara could not remember whether Appellant had identified her stepfather or grandfather as the sexual offender. O'Hara also recalled Appellant's description of an unusual form of abuse in which the abuser would hang Appellant upside down in the bathroom, smear raw hamburger on her body, and lick it off. Because he thought he should inform someone that Appellant's claim of childhood sexual abuse had not been fabricated, O'Hara spoke with two assistant district attorneys, provided a statement to police, and spoke with Appellant's defense counsel. Appellant thereafter sought a new trial, testified that she did not remember informing O'Hara of the sexual abuse, and asserted that O'Hara's testimony was newly-discovered evidence.

*Standard of Review*

We review a trial court's ruling on a motion for new trial for an abuse of discretion. *See State v. Herndon*, 215 S.W.3d 901, 906 (Tex.Crim.App. 2007). We do not substitute our judgment for that of the trial court but, rather, decide whether the trial court's ruling is arbitrary or unreasonable. *Holden v. State*, 201 S.W.3d 761, 763 (Tex.Crim.App. 2006). A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Holden*, 201 S.W.3d at 763; *Charles v. State*, 146 S.W.3d 204, 208 (Tex.Crim.App. 2004).

*Analysis*

Section 40.001 of the Texas Code of Criminal Procedure provides that "[a] new trial shall

6

be granted an accused where material evidence favorable to the accused has been discovered since trial." TEX. CODE CRIM. PROC. ANN. art. 40.001 (West 2006). Because the standard of "materiality" varies according to context, article 40.001 may be satisfied under the four-pronged *Keeter* test when it is established that: (1) the new evidence was unknown or unavailable to the defendant at the time of trial; (2) the defendant's failure to discover or obtain the evidence was not due to a lack of diligence; (3) the new evidence is admissible and is not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result on another trial. *Keeter v. State*, 74 S.W.3d 31, 36-37 (Tex.Crim.App. 2002).

The Texas Court of Criminal Appeals has held Rule of Evidence 801(e)(1)(B) provides "substantive, non-hearsay status" to prior consistent statements of a witness that are offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive. TEX. R. EVID. 801(e)(1)(B); *Hammons v. State*, 239 S.W.3d 798, 804 (Tex.Crim.App. 2007). To be admissible, the prior consistent statement must be made before the motive to fabricate arose. *Hammons*, 239 S.W.3d at 804; *Dowthitt v. State*, 931 S.W.2d 244, 263 (Tex.Crim.App. 1996).

As to the first two *Keeter* prongs, the trial court found that O'Hara's testimony was newly discovered evidence, unknown or unavailable to Appellant at the time of trial and that her failure to discover or obtain the evidence was not due to a lack of diligence. *Keeter*, 74 S.W.3d at 36-37. The trial court found that Appellant had not satisfied the third *Keeter* prong, refrained from addressing the fourth *Keeter* prong, and denied Appellant's motion for new trial. TEX. CODE CRIM. PROC. ANN. art. 40.001; *Keeter*, 74 S.W.3d at 36-37.

7

In the capital murder trial, Appellant had claimed that her grandmother's boyfriend had also sexually assaulted her, but at the motion for new trial hearing, Appellant testified that that abuse had not involved hanging her in the shower or the use of raw meat, and specified that her grandmother's boyfriend was never her grandfather.

At the motion for new trial hearing, the State argued that O'Hara's testimony was both cumulative and corroborative of Appellant's own testimony and perhaps of documentary evidence by which Appellant attempted to establish that she had been sexually abused by Javier. The trial court abused its discretion in this regard, however, because the test is not whether the evidence is cumulative or corroborative, but whether it is merely so. *Carlisle v. State*, 549 S.W.2d 698, 704-705 (Tex.Crim.App. 1977).

While acknowledging that O'Hara's testimony would have tended to confirm Appellant's claims of childhood sexual abuse, Appellant argues that her testimony would have been more than merely cumulative or corroborative because it would have overcome, in a way no other evidence offered at trial did, the suggestion of the State that Appellant had recently fabricated her claim of sexual assault during the CPS investigation, or during the period leading up to it, in order to damage the image of the Quirozes as proper guardians for Andrea. *See Hammons*, 239 S.W.3d at 804; TEX. R. EVID. 801(e)(1)(B). Appellant also notes that O'Hara's testimony would not have been admissible at trial for any other purpose. *See* TEX. R. EVID. 613(c). Accordingly, she argues that the trial court abused its discretion in holding that O'Hara's testimony would have been merely cumulative, collateral, corroborative, or impeaching, and that the third *Keeter* prong had not been satisfied. We agree.

Although O'Hara's testimony does tend to corroborate that of Appellant, it is not merely

8

corroborative. O'Hara's testimony overcomes, and would be admissible only because it overcomes, the State's assertion of Appellant's recent fabrication. O'Hara's testimony has independent, evidentiary value beyond corroboration. Appellant's credibility was essential to her defense and O'Hara's testimony could have proved that Appellant was not the liar that the State alleged her to be. Accordingly, Appellant satisfied the third *Keeter* prong.

We next consider whether Appellant's new evidence satisfies the fourth *Keeter* prong. *Keeter*, 74 S.W.3d at 36-37. To meet this prong for establishing materiality, Appellant was required to establish that the new evidence is probably true and will probably bring about a different result on another trial. *Keeter*, 74 S.W.3d at 36-37.

The State did not argue that O'Hara was lying or mistaken about Laura's outcry to him thirty years earlier. Rather, the State argued that O'Hara's testimony was similar to that of witnesses Lorena Ponce and Mary Ann Mayham, who testified that Appellant had informed them, respectively, between 1996 to 1998 and in 2008, of incidents of childhood sexual abuse, and maintained that evidence of Appellant's guilt was so overwhelming that O'Hara's testimony would not have likely made any difference to the jurors. The State contended that the jurors did not believe Appellant's acts were reckless and argued that if Appellant did not act recklessly, her acts were intentional. The State also suggested that some of the jurors probably believed Appellant's sexual abuse allegations and found her guilty of capital murder anyway.

Appellant maintains the State's argument should be rejected as implausible and as affording inadequate deference to the jury's fact finding responsibility, and that it is not necessarily true that if an act is not reckless that it must be intentional. It is Appellant's contention that three different results might reasonably follow from O'Hara's recollections of

9

Laura's past, each of which depended upon the jury believing that Appellant had been sexually abused during childhood by Javier. In the first, Appellant maintains the jurors might not have been convinced beyond a reasonable doubt that she specifically intended to cause death, knew that death was substantially certain to result, or consciously disregarded a risk that death would result when she fired the shots that killed the Quirozes.

In the second, Appellant contends that the jurors, if they believed Appellant had been sexually abused by Javier as she contended, might have thought Appellant fired at the Quirozes, consciously disregarding a substantial risk that they would die, even though it was not Appellant's intention or belief that they would be killed, in order to prevent the Quirozes' interference with her objective of taking Andrea to the police or to a physician. In that instance, the jury would have been required under the trial court's charge to convict Appellant of manslaughter rather than capital murder.

Last, Appellant asserts that if the jurors were unable to agree that Appellant was guilty of capital murder, of a lesser-included offense, or of anything at all, they would have been unable to reach a verdict, and Appellant would benefit from the presumption of innocence. At most, Appellant would then be exposed to re-prosecution for capital murder.

The probability of these alternative results is dependent upon the belief of one or more jurors that Appellant's mental state was not such that she acted intentionally or knowingly with respect to the result of her conduct, which was fairly raised by expert and lay testimony, vigorously contested by the State, and argued by defense counsel before the jury. The jury was expressly authorized by the trial court's charge to convict Appellant of a lesser-included offense, which differed from the charged offense only in respect of the culpable mental state required for

10

conviction, and such instruction is not permitted unless the evidence fairly supports a rational belief that Appellant did not act intentionally or knowingly. *Flores v. State*, 245 S.W.3d 432, 439-41 (Tex.Crim.App. 2008). Because the State argued that Appellant was lying about and had recently fabricated the sexual abuse she claimed to have suffered by Javier, O'Hara's testimony, establishing that Appellant made an outcry about such abuse thirty years earlier would have made an acquittal, a conviction for a lesser offense, or a hung jury substantially more probable.

Appellant was entitled to have a jury hear all evidence relevant to the issue of her mental state at the time she fired the fatal shots. Because there is evidence which the jury did not hear, through no fault of Appellant or her attorneys, and because the evidence is of sufficient probative value to alter the outcome of the trial, a jury should consider and pass upon that evidence. The fourth *Keeter* prong has been satisfied. *Keeter*, 74 S.W.3d at 36-37.

Because the four *Keeter* prongs have been met, the trial court was required to grant Appellant a new trial under Section 40.001 of the Texas Code of Criminal Procedure, and abused its discretion in failing to do so. TEX. CODE CRIM. PROC. ANN. art. 40.001. Issue One is sustained.

### *Self-Defense Instruction*

In Issue Two, Appellant asserts the trial court erred when it refused her request that the jury charge include an instruction on the law of self-defense. Because we have sustained Issue One, we need not address Issue Two.

### CONCLUSION

The trial court's judgment is reversed and the case is remanded for a new trial.

GUADALUPE RIVERA, Justice

11

October 9, 2013

Before McClure, C.J., Rivera, J., and Larsen, J. (Senior Judge)
Larsen, J. (Senior Judge), sitting by assignment

(Publish)