Randall Dean LONG, Appellant,

v.

The STATE of Texas, Appellee.

No. 09 85 287 CR.

Court of Appeals of Texas, Beaumont.

Oct. 7, 1987.

Rehearing Denied Oct. 28, 1987.
Discretionary Review Granted (Appellant) Feb. 10, 1988.
Discretionary Review Refused (State) Feb. 10, 1988.

**100**

Joseph Saranello, Houston, Janet Seymour Morrow, Morrow & Burnett, Houston, for appellant.

R.F. "Bo" Horka, Dist. Atty., and Richard B. Dutton, Asst. Dist. Atty., Hardin County, Kountze, for appellee.

## OPINION

BURGESS, Justice.

A jury found Appellant guilty of murder and assessed his punishment at fifty-five years confinement in the Texas Department of Corrections. Appellant brings forth ten points of error. Since he complains, in part, of insufficiency of the evidence, the facts of the case will be discussed in some detail.

Appellant arrived at Doc Holidays, a nightclub, around 9:00 p.m. on Friday, November 11, 1983. Lisa Wilber, the deceased, along with two friends, arrived there at approximately 12:30 a.m. on November 12, 1983. Testimony concerning what time the events of the evening occurred was generally inexact. To confuse matters further, an employee testified that the club customarily turned its clocks ahead fifteen minutes.

Appellant testified that he danced several dances with Lisa Wilber and that they sat together at his table between dances. Appellant also testified that Lisa Wilber wore his cowboy hat during one dance. An employee stationed at the door stated that she saw Lisa Wilber and Appellant walk out of the club holding hands just before the lights came on, between approximately 1:30 a.m. and 1:45 a.m. The State produced no witness who saw Lisa Wilber get into Appellant's car, leave with Appellant or even placed Appellant and Lisa Wilber together in the parking lot.

Appellant testified that he initially asked Lisa Wilber to go riding in his "hot rod car" (by his own description) because they had been discussing his recent attempts to sell the car and she had expressed an interest in fast cars. He stated that she declined because one of her friends would not give her permission to go; the friend's testimony was in accord. Appellant testi-

fied that, at the end of the evening, he told Lisa Wilber he would have to leave since he was going deer hunting the following day and asked her if she would at least like to see the car in the event she came to know of someone who might like to buy it. According to his account, they exited the club together. As she was walking around the car examining it, he opened his door and stood between the door and car. They kissed several times. He then got in the car and threw his hat in the back seat. They kissed again through the open driver's window. He then drove away leaving her standing in the spot where the car had been parked and did not see her leave that spot.

Appellant testified that he arrived home at 3:00 Saturday morning. His next door neighbor testified she was up that morning feeding her infant daughter when she heard Appellant's car drive up a few minutes past 3:00 a.m. She recognized the sound of Appellant's car from its loud mufflers. She did not look to see if anyone was with Appellant but said she heard only one door shut.

Over Appellant's objections, Mary Denise Hendricks Domingue testified that she met Appellant at Doc Holidays at 9:30 p.m. on the evening in question and that they talked and danced several dances together. According to Domingue, Appellant asked her to leave to go riding in his car and, when she declined, he got "offensive" and "pushy" and insisted:

"I turned to walk away and he even grabbed me. He told me that I couldn't treat him like that, and that I didn't have the right to walk away from him like that.... He told me he would find a way to get back at me somehow or someway, and if I didn't leave with him that he would find someone that would."

Although she had had similar confrontations in such clubs in the past and normally stayed until the last dance, on this occasion Domingue testified she left early to avoid further contact with Appellant. On cross-examination, Domingue acknowledged that she had failed to tell anyone of the encounter with Appellant although she had ample opportunity.

Appellant's account of meeting Domingue varied significantly. Appellant testified that he danced with her only once and that they talked only about a jacket his ex-wife had left in her possession. Appellant directly denied attempting to get Domingue to leave with him and grabbing her arm and stated he simply walked away.

Appellant and his friend Richard Lock were avid deer hunters, had hunted together for many years, and had hunted opening days together on previous occasions. Saturday, November 12, 1983, was the opening day of deer season. Lock testified he knocked softly at Appellant's door at 5:30 that morning, and although Appellant's car was in the drive, there was no response. Both men testified they hunted later that day.

The evidence showed that Appellant was a married man and that his wife was out of town on the evening in question. According to Appellant, he learned his wife would be returning from Oklahoma on Saturday evening and cancelled his plans to go out again that evening, took a bath and washed his clothes to remove the smell of cologne from them before his wife returned. After the police first questioned Appellant, Woodrow Wales, an acquaintance of Appellant, spoke with him and asked him why he had not given his clothes to the police. According to Wales, Appellant replied simply that it was because he had washed the clothes. He said that he did not know why Appellant washed his clothes. Appellant testified, however, that he also told Wales the reason he had washed his clothes: to get the smell of cologne off them before his wife came home. Wales also stated that later, Appellant and his attorney attempted to get him to change his story to conform to that of Appellant.

On November 15, 1983, three days after Lisa Wilber disappeared, two detectives from the Beaumont Police Department questioned Appellant and obtained his consent to search his car. Detective Coffin testified he removed hairs from the back floorboard of Appellant's car at that time.

He further testified that the car appeared "trashy," and appeared not to have been recently cleaned out. Those hairs were deposited with a local forensic laboratory. In February of 1984, Appellant sold the car.

On May 8, 1984, human skeletal remains were found in Honey Island, Hardin County, near Bracken Cemetary Road and positively identified from orthodontic records as those of Lisa Wilber. At trial it was established that Appellant belonged to a hunting club in 1980, 1981, and 1982. One of the club's officers agreed that club property included land "up behind Bracken Cemetary" and that one access to the land is Bracken Cemetary Road. Appellant and his long-time hunting partner both testified they had hunted on club property and had a deer blind four to five miles west of Honey Island.

Phyllis Marshall, the State's forensic expert, testified that she was called to the scene on May 8th and collected the virtually complete scalp hair from the remains. Marshall, an expert in the microscopic analysis of hair, compared the hairs taken from the remains with those taken from the back floorboard of Appellant's car in November. She found two of those hairs to be "similar to and consistent with" hairs taken from the remains. Marshall later resisted the State's attempt to incorrectly recapitulate her testimony thus:

"Q. I believe you already testified it was hair similar to and microscopically *identical* to the hair of Lisa Moye Wilber, is that correct?

"A. Microscopically similar to and consistent with, yes, sir." (emphasis added)

On May 16, 1984, after examining the back floorboard hairs, Marshall herself conducted another search of Appellant's car. By this time, the car had been out of Appellant's possession for about three months. She testified that the vehicle was "trashy" and did not look as though it had been recently cleaned out. The record shows that, in the course of this second search, she removed certain hairs from the "hatchback" area of the car. She testified that she found two of those hairs to be micro-

scopically "similar to and consistent with" Lisa Wilber's hair. The prosecutor then asked:

"Q. So in your opinion, the hair that was located in the hatch back of that vehicle was the same hair that you obtained from the body out there off Bracken Cemetery Road?

"A. Yes, sir."

In addition, Marshall testified that on one of these hairs were microscopic amounts of what, in her opinion, appeared to be blood and that whether the blood was animal or human blood was open to speculation.

The next day the car was searched a third time. This time it was taken to the sheriff's department and its seats removed. Marshall stated that hairs were found in the front passenger seat, and "other parts of the car," but that those in the front passenger seat were significant. She agreed with the prosecutor that hairs were taken "from the passenger's seat area, the floor board and the seat" and in the crease of the seat. The following exchange then took place:

"Q. Would you tell the jury what significance, if anything, you found about *that hair.*

"A. Yes, sir. I found *two of the hairs* that were microscopically similar to and consistent with the Lisa Wilber hair." (emphasis added)

In addition, an earring back was found under the driver's seat at that time.

At trial, the State introduced a pierced earring similar to the one Lisa Wilber wore the night she disappeared. Lisa Wilber's friend identified the earring back found in Appellant's car as such and stated that it would fit on any pierced earring and on the earring introduced by the State. She further testified that there are generally two different types of earring backs and that she did not see what type earring back Lisa Wilber actually wore the night in question.

Both sides elicited detailed information on the science of forensic hair analysis. The jury heard three experts testify about two different techniques of hair comparison: microscopic analysis and neutron activation analysis. Appellant's expert, not

having been given the opportunity to microscopically examine those hairs considered by State's expert to be "similar to" those of the deceased, testified solely on the procedures and limitations of the microscopic analysis of hair generally.

Two experts in the microscopic analysis of hair, one for the prosecution and one for the defense, testified that an analyst cannot, using that technique, compare two hairs and say, to the exclusion of all other people, that they came from the same person. About the strongest statement one could make is that the hair of an unknown source is "similar to and consistent with" hair from a known source; *i.e.*, that the two hair samples could have come from the same source. On cross-examination of the State's expert the following exchange took place:

"A. [BY MARSHALL] I mean I could not say—one could not say hair definitely came from an individual. It could have, but in my opinion it may be that person's hair. So I can—

. . . .

"Q. [BY DEFENSE COUNSEL] What you are telling the jury is that the hair that was found in the vehicle may be that of Lisa Wilber's.

"A. And in my opinion it was so close that it was."

Making the comparison under this technique involves cleaning the hair with certain chemical solutions and then examining its characteristics under a comparison microscope. The more characteristics the two hairs have in common, the stronger the similarity. However, both experts agreed that reducing to a numerical expression the probability of two hairs coming from the same source was not yet possible and research on such probabilities was still under way. The expert for the defense stated that exposure to the elements would make a comparison more difficult and would distort the characteristics of the hair sample.

Dr. John Randall of Texas A & M University performed the neutron activation analysis but was unable to reach any conclusion about the hairs. He testified that, unlike the microscopic analysis, neutron ac-

tivation allowed the examiner to determine with reasonable accuracy that a given hair came from a given source. The test is performed by first subjecting certain trace elements commonly absorbed by human hair, from the environment or otherwise, to radiation making them easier to detect and then comparing the distribution of those elements in the different hair samples. In this case, a neutron activation analysis was conducted of hair from the remains of Lisa Wilber and hair from Appellant's car considered by Phyllis Marshall to be "similar." Dr. Randall was unable to reach a conclusion because of the highly contaminated state of the hair taken from the remains, probably due to prolonged exposure to the elements.

■■■■ In points of error four through seven, Appellant asserts that the trial court erred in overruling his challenge for cause to four veniremen who had a bias against the law allowing a defendant not to testify at trial, citing *TEX.CODE CRIM.PROC. ANN. art. 35.16(a)(9)* (Vernon Supp.1987). Appellant exhausted his peremptory challenges, being forced to use four of them on the panelists he asserts were subject to challenge for cause. The trial court denied Appellant's request for additional peremptory strikes, and Appellant was left with three objectionable veniremen, two of whom were struck by the State and one of whom was seated as a juror. Appellant thus establishes harm caused by any error in denying his challenges for cause. *Hernandez v. State*, 563 S.W.2d 947, 948 (Tex. Crim.App.1978) (On Appellant's Second Motion for Rehearing).

Each of the panelists answered a questionnaire submitted by Appellant containing the question: "Would it be more difficult for you to find an accused person innocent if he did not testify at the trial than if he did testify?" On the basis of their answers to that question, the four veniremen were individually interrogated.

One venireman initially stated that the question was a "tough" one and that he "didn't know how to answer that." He stated that if Appellant chose not to testify at trial he would not "hold it against"

Appellant but also that he might be "maybe more inclined" to find him guilty. He expressed his opinion that an innocent man would probably want to testify, but when asked by the State, "You are not saying just because he didn't testify, he must be guilty?" he answered, "No." He stated that he thought he could lay aside those feelings but that if he were in Appellant's shoes and he was innocent, he would testify on his own behalf. Ultimately, he said Appellant's not testifying would not enter into his deliberations. The other three veniremen stated they would not consider Appellant's failure to testify a sign of guilt and that they would look to the evidence and follow the judge's instructions.

In *Scott v. State*, 490 S.W.2d 578, 579 (Tex.Crim.App.1973), two veniremen similarly testified that they would infer guilt if Appellant failed to testify. The Court of Criminal Appeals held that they were successfully rehabilitated by eliciting from one that he would place no burden upon the defendant to bring any evidence of his innocence and from the other that she would not "hold it against Appellant" if he did not testify, nor consider his failure to testify as evidence of his guilt.

Since the trial court is in a position to observe a venireman's demeanor, due deference should be accorded its rulings on the acceptability of a prospective juror. Considering the voir dire as a whole, we cannot say that the trial court abused its discretion in denying Appellant's challenges for cause. *See Bell v. State*, 724 S.W.2d 780, 797 (Tex.Crim.App.1986). Appellant's points of error four through seven are overruled.

■ In his eighth point of error, Appellant argues that the trial court abused its discretion in denying Appellant's motion for a change of venue based upon prejudicial pre-trial publicity, in violation of *TEX.CODE CRIM.PROC.ANN. art. 31.03* (Vernon Supp.1987) and due process of law. *U.S. CONST. amend. V* and *TEX. CONST. art. I, sec. 10*.

Appellant filed a motion to change venue, accompanied by his affidavit and the affidavits of two residents of Hardin County, pursuant to *article 31.03*. The State filed a controverting affidavit as provided under *TEX.CODE CRIM.PROC.ANN. art. 31.04* (Vernon 1966). At the hearing on the motion, Appellant produced two witnesses who testified they had seen publicity of the case in newspapers and on television, had talked to people in the community, and were of the opinion that Appellant would not get a fair trial in Hardin County. In addition, Appellant introduced newspaper articles and television news tapes covering various aspects of the case. The State produced three witnesses at the hearing who testified they, too, had heard accounts of the case through various media but that Appellant would nonetheless be able to obtain a fair and impartial trial.

In deciding whether to grant a motion to change venue, the trial court must determine whether outside influences affecting the community's climate of opinion as to a defendant are inherently suspect. *Phillips v. State*, 701 S.W.2d 875, 879 (Tex.Crim. App.1985), *cert. denied*, — U.S. ——, 106 S.Ct. 3285, 91 L.Ed.2d 57 (1986); *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). When, as in this case, the trial court is presented with conflicting evidence, its decision will only be overturned upon a showing of abuse of discretion. *Eckert v. State*, 623 S.W.2d 359, 363 (Tex.Crim.App.1981). *See also Phillips*, 701 S.W.2d at 879.

After carefully reviewing the newspaper and television news stories, testimony at the hearing, and voir dire, we find that Appellant has not met his admittedly "heavy burden" of proving such a prejudice in the community that the likelihood of obtaining a fair and impartial jury is doubtful. Absent such a showing, no abuse of discretion occurs. *Nethery v. State*, 692 S.W.2d 686, 694 (Tex.Crim.App.1985), *cert. denied*, 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986). Appellant argues in part that only a handful of veniremen indicated they had not heard, read, or seen media reports of Lisa Wilber's disappearance or death or Appellant's arrest and indictment. The standard, however, does not require that jurors be totally ignorant

of the facts and issues. Rather the publicity must be pervasive, prejudicial and inflammatory. *Phillips,* 701 S.W.2d at 879. We cannot say the trial court abused its discretion in resolving these issues against Appellant. Appellant's eighth point of error is overruled.

■ Appellant urges in his ninth point of error that the trial court erred in admitting evidence of an extraneous act of misconduct. The evidence complained of consisted of the testimony of Denise Domingue that Appellant got "offensive" and grabbed her when she refused to go riding with him that night. The State contends that evidence was admissible under the case law and *TEX.PENAL CODE ANN. sec. 19.06* (Vernon 1974) in that it was probative of Appellant's state of mind the evening of the offense. *See Albrecht v. State,* 486 S.W.2d 97, 100 (Tex.Crim.App. 1972). It was recently explained in *Werner v. State,* 711 S.W.2d 639, 644 (Tex.Crim. App.1986) that "[s]ection 19.06 gives the Appellant no more special comfort than the general rules of evidence" and that evidence of a defendant's state of mind under section 19.06 must nonetheless pass tests of relevancy and materiality.

The "true test" for determining the admissibility of evidence of an extraneous offense[1] was set out in *Williams v. State,* 662 S.W.2d 344, 346 (Tex.Crim.App.1983). Such an act may be admissible if the prosecution shows (1) that the transaction is relevant to a material issue in the case and (2) that the relevancy value of the evidence outweighs its inflammatory or prejudicial potential. This two-part evaluation is left to the trial judge, and absent a clear abuse of discretion, his decision will not be disturbed on appeal. *Templin v. State,* 711 S.W.2d 30, 33 (Tex.Crim.App.1986).

The court below acted within its discretion in finding the transaction in question relevant to Appellant's state of mind on the evening in question; that is, that his purpose in going to the club was to leave with a woman. Relevancy is that which makes the proposition at issue more or less probable. *Garza v. State,* 715 S.W.2d 642, 644 (Tex.Crim.App.1986). The extraneous transaction occurred only a few hours before Lisa Wilber disappeared. Moreover, the probative value of the evidence is not outweighed by any inflammatory or prejudicial potential. The transaction was not of an inherently inflammatory nature, nor was it introduced or argued as a criminal offense. *See Plante v. State,* 692 S.W.2d 487, 494 (Tex.Crim.App.1985). Appellant's ninth point of error is overruled.

■ Appellant, in his first point of error, claims he was denied due process of law and his right of cross-examination by the trial court's refusal to exclude the State's testimony on microscopic hair comparison after the State violated the court's order to provide hair samples to the defense for its own comparison.

Appellant filed his "Motion to Examine Evidence Examined by the State" requesting discovery of, *inter alia:*

"1. All hair samples obtained from the following:
    a. The deceased;
    b. Items belonging to the deceased;
    c. The Defendant;
    d. Items belonging to the Defendant; and
    e. Any and all other other [sic] samples of hair obtained or tested in the investigation of the disappearance and death of Lisa M. Wilbur."

After a hearing, that motion was granted by the court on November 15, 1984. Argument on the motion at the hearing was as follows:

[DEFENSE COUNSEL]: We have the Motion to Examine Evidence which has been examined by the State. I believe that Mr. Horka does not oppose that. It is just a matter of setting up the time to do that.

---

1. The term "extraneous offense" refers to prior conduct by an accused punishable as a criminal offense. The State admitted that the challenged conduct probably did not rise to the level of criminal conduct. However, whether prior conduct constitutes a criminal offense or not, the same analysis must be used to determine admissibility. *Templin v. State,* 711 S.W.2d 30, 32 (Tex.Crim.App.1986).

[STATE'S COUNSEL]: That will have to be subsequent to—I am having the evidence sent to our Washington D.C. F.B.I. laboratory.

As soon as they complete their tests on it, I will notify counsel and have it available for his use.

\* \* \* \* \* \*

BY THE COURT: He wants to know a place and time he can inspect it.

[STATE'S COUNSEL]: Judge, we have to leave that subject to me getting it back. He and I will get together as soon as I get it back or I will notify his office as soon as I know when.

Then he can get his expert. He will have to pick a time and we will have to inform the court as soon as we can make that decision.

[DEFENSE COUNSEL]: That is acceptable to me, Your Honor, as long as the Court understands that if it goes further into the year, we will request another setting date for trial.

The court ordered the inspection to take place "at time mutually convenient for State and Defendant not later than February 4, 1985."

The requested hair was not produced by February 4th. It appears that defense counsel contacted the State's investigator about February 1st and was told the six hairs considered by State's expert to be microscopically "similar" had been sent to Dr. John Randall at Texas A & M University for neutron activation analysis. Defense counsel was informed that it would take two weeks "for the radioactivity to get off" the samples so they could be handled, a statement which later proved false. In response, Appellant filed a written motion for continuance which was heard by the court February 8th. The State was apparently unaware when it sent the hairs to Dr. Randall that preparation for and execution of this second test made any further microscopic analysis impossible. At the February 8, 1985, hearing on Appellant's motion for continuance, the State apprised the court that the hair had already been chemically treated and placed in slides in preparation for neutron activation analy-

sis. The State's expert represented the test as 100% conclusive, either in favor of or against Appellant, and further testified that conducting another microscopic would preclude a later neutron activation test. After further consideration and independent investigation, the trial court allowed the neutron test to proceed and denied Appellant's motion to exclude the result of the microscopic analysis performed by the State's expert.

Appellant urges exclusion of the hair for two acts committed by the State: violation of a discovery order and destruction of evidence. *Lindley v. State*, 635 S.W.2d 541, 543 (Tex.Crim.App.1982) is cited for the proposition that when a trial court grants a motion for discovery and the prosecution fails to disclose that evidence ordered disclosed by the trial court, then that evidence should be excluded if offered by the State at trial. The *Lindley* court, however, in applying that rule, examined the motion and order for specificity and unambiguity, looking to arguments made at the hearing, and searched the record for harm to the defendant.

Appellant argues in part that by virtue of the discovery order, the prosecution was under a duty to produce the hair by a certain date. The record of the hearing, however, contradicts that assertion. In fact, Appellant, upon learning the evidence would not be produced by February 4th, filed, not a motion to exclude, but rather a motion for continuance. All parties understood that the "no later than February 4, 1985" language did not create a duty in the State to produce by that date, but rather a right in Appellant to have the trial continued.

Equally clear from the record is that neither the parties nor the court contemplated nuclear activation testing when the discovery order was entered. The trial court may have found his order was not violated, although no express finding or conclusion of law appears in the record. This court will presume that the trial court made all necessary findings to support its ruling, if such findings are supported by the evidence. *Cf. Merritt v. State*, 643

S.W.2d 448, 450 (Tex.App.—Corpus Christi 1982, no pet.). Expressed in terms of *Lindley*, the discovery order was lacking in specificity to the extent it did not encompass any nuclear activation testing undertaken by the State.

Further, expert testimony based on evidence destroyed by the State in the process of testing should not be excluded absent a showing of bad faith. *See Lake v. State*, 577 S.W.2d 245, 246 (Tex.Crim.App.1979). Undisputedly, the State, when it sent the hair to Dr. Randall, was unaware that preparation and execution of the nuclear activation test would effectively destroy the hairs for the purpose of microscopic examination. Appellant argues, however, that the State's carelessness amounts to bad faith, and, as authority, quotes *Lake*, 577 S.W.2d at 246:

> "Of course, the state must not be allowed to purposefully or carelessly destroy evidence with an eye to harming a defendant, but there was no showing of bad faith on the state's part in this case. The heroin was destroyed by order of the trial court after the first trial, and the prosecutor did not discover the fact until the day before the trial."

Upon closer examination, however, the quoted language in *Lake* condemns the destruction of evidence "with an eye toward harming the defendant." The record fails to show that the State's actions, whether denominated purposeful or careless, were undertaken with an intent to harm Appellant. In fact, State's counsel admitted any test results could have been 100% in Appellant's favor. Appellant's first ground of error is overruled.

■■■■ Appellant, in his second ground of error, asserts that the circumstantial evidence was insufficient to support the conviction. Whether by direct or circumstantial evidence, the State, of course, must prove each element of its case beyond a reasonable doubt. *U.S. CONST. amend. V & amend. XIV; TEX. CONST. art. I, sec. 19.*

The standard for review of both direct and circumstantial evidence cases is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. State*, 672 S.W.2d 801, 803 (Tex.Crim.App. 1984). If a circumstantial evidence case is to measure up to this standard, an appellate court must determine that the circumstances exclude every other reasonable hypothesis except that of the guilt of the defendant. *Johnson v. State*, 673 S.W.2d 190, 195 (Tex.Crim.App.1984).

Every circumstantial evidence case must be tested for sufficiency of the evidence on its own facts. *Id.* A reviewing court will look at all the evidence in the light most favorable to the verdict. *Houston v. State*, 663 S.W.2d 455, 456 (Tex.Crim.App.1984).

The State's evidence consisted primarily of seven circumstances, briefly stated: (1) Appellant was the last person seen with the deceased before her disappearance; (2) six hairs found in Appellant's car were microscopically similar to those of the deceased; (3) an earring back similar to one which might have been worn by the deceased was found in Appellant's car; (4) Appellant asked another woman at the club to go riding with him and when she declined he got "pushy"; (5) Appellant was familiar with the area where the body was found; (6) Appellant washed the clothes he was wearing the night in question; (7) Appellant overslept on the opening day of deer season.

The case before us is strikingly similar in many respects to that of *Stogsdill v. State*, 552 S.W.2d 481 (Tex.Crim.App.1977), in which the court held the circumstantial evidence insufficient. The only evidence connecting the defendant in that case with the crime was that of tire tracks at the scene and hair found in the defendant's car. As in the instant case, the defendant was never connected with the murder weapon.

Expert testimony concerning the microscopic examination of the hair samples was virtually the same as the case before us. In addition, a neutron activation test had been successfully conducted (although there was one discrepancy in the hairs compared) showing an extraordinarily high probability that the hair in the defendant's car came from the deceased. Further, the defendant in *Stogsdill* sold a pickup truck

about two weeks after the murder, and all the hair (as 4 of 6 significant hairs in this case) had been collected from the truck over three months after the sale. Significantly, however, unlike the case before us, the defendant had not been placed in the pickup the date of the murder nor shown to have owned the vehicle on the date in question.

In *Stogsdill,* tire tracks at the scene had been analyzed. The treads were found to be similar to those of the tires on the car defendant had sold, but the comparison was far from conclusive, as was that of wheel-base measurements taken of the tracks and the vehicle. In this case, evidence of the earring back is equally inconclusive. No expert testimony was offered, but rather the testimony of the friend, who stated that she did not know what type of earring back the deceased wore the night in question and that the earring back found in Appellant's car would fit on any pierced earring.

Evidence of an extraneous transaction in *Stogsdill* consisted of a statement made by the defendant to a hitchhiker expressing a desire to mutilate the hitchhiker in exactly the same manner the body of the deceased had been multilated. The statement was admitted for purposes of identity, but the court concluded it did not prove the defendant committed the crime. The extraneous transaction in this case went to Appellant's state of mind: his intention to leave the club with a woman that night and his "offensive" reaction when refused. It does not affirmatively connect Appellant with the crime charged.

Most significantly, the defendant in *Stogsdill* was not placed in the company of the deceased nor was he shown to have been at or near the scene of the crime. Appellant here was shown to have danced with the deceased most of the evening and left the club with her. No one, however, placed them together in Appellant's car. Although Appellant was never seen at or near the place where the body was found, he was shown to have been familiar with the area by virtue of his hunting activities. *Flores v. State,* 551 S.W.2d 364 (Tex.Crim.

App.1977) (reversed and remanded for insufficient evidence) can also be distinguished on these grounds. In *Easley v. State,* 529 S.W.2d 522 (Tex.Crim.App.1975) (reversed and remanded for insufficient evidence), the weight of the physical evidence was similar to that of the instant case, but the defendant had been seen merely driving through the victim's neighborhood in the weeks prior to the killing and had not been placed in her company.

Although each fact in the case before us does not point directly and independently to the guilt of the accused, it need not. The cumulative effect of all the incriminating facts is sufficient to support the conviction. *Flores,* 551 S.W.2d at 367, and *Stogsdill,* 552 S.W.2d at 486. Appellant's second point of error is overruled.

Appellant's third point of error asserts that the trial court erred in denying his motion for new trial based upon newly discovered evidence pursuant to *TEX. CODE CRIM.PROC.ANN. art. 40.03(6)* (Vernon 1979), *repealed by* Acts 1985, ch. 685, sec. 4, 1985 Tex.Gen.Laws 2472 (effective September 1, 1986).

The case was submitted to the jury on October 11, 1985, and the same day a verdict of guilty was returned. Appellant was sentenced October 15, 1985. On October 30, 1985, Appellant filed a motion for new trial on the grounds of newly discovered evidence, and a hearing was held December 16, 1985. The newly discovered evidence consisted of the testimony of Franklin "Butch" Fielder who, on the morning in question, along with three other men, was present at Sugar's, a strip joint in the vicinity of Doc Holidays. There they encountered a young woman escorted by two men other than Appellant. At the time of the hearing, Franklin Fielder was of the opinion the young woman was Lisa Wilber. Two of the men accompanying him that night, David Kirkendall and Marvin Segrest, were of the opposite opinion and their testimony was offered by the State in rebuttal.

As to the events of that morning, the three witnesses are in accord in all the major details. By all accounts Fielder,

Kirkendall, Marvin Segrest, and Mark Segrest (who did not testify) worked until midnight and then drove together to Beaumont to Sugar's at 11th Street and Washington Blvd., drinking several beers a piece as they drove. Once again, the actual timing of each event was uncertain. Fielder and Segrest agreed that they arrived at Sugar's between 1:15 and 1:30 that morning and stayed there a total of 30–45 minutes before the lights came on at closing time. Fielder testified that he saw the young woman enter the club with two men about five to ten minutes after they had arrived. The other two testified they did not actually see her enter the club, but first noticed her later at the juke box. All three men remarked that it was unusual to see a woman in such a strip joint when she did not work there.

At some point the girl went to the juke box and changed the song while the stripper on stage was still dancing to it. The stripper left the stage and went down to the juke box and she and the girl talked. The girl then sat down as the woman ejected that song and punched up a new one.

As the stripper danced to the second song, the group, especially Fielder, began "hurrahing" the girl, now sitting at her table, suggesting that she, too, get up and dance. There was apparently a good deal of yelling back and forth between the tables. Fielder went over to the table where she was sitting, and he and one of the men there "almost came to blows." The girl finally succumbed to their prodding and danced what was described as the "funky chicken" on stage, fully clad but in stocking feet. Two of the witnesses believe she was the last one to dance before the club closed.

Fielder described the girl as looking about 20 years old, wearing blue jeans and white socks. Kirkendall described her as wearing jeans, white socks, and a pullover sweater that was:

"A. ... striped across this way, light, soft pretty colors. Just striped, no solid, no—

"Q. [BY THE STATE]: The black light was picking up these stripes—

"A. Yes, sir."

Photographs of the remains of the deceased were introduced into evidence at trial showing, among other things, the clothes she was wearing upon her disappearance and death. That clothing included blue jeans, a distinctive pair of cowboy boots, and a pullover sweater striped horizontally with pastel pink and blue stripes.

Fielder testified that he saw pictures of Lisa Wilber in the media a few days after the incident and recognized her as the girl at Sugar's and that he was still of that opinion. Kirkendall admitted that in November, 1983, he, too, was of the opinion that the girl at Sugar's was Lisa Wilber, but that two years after the occurrence he watched a videotape of Lisa Wilber and changed his mind. He also admitted to being "highly intoxicated" on the night in question and at one point stated:

"A. ... The only time I really saw her, a good focused job of it, was when she was dancing on the dance floor. Other than that it was dark, very well dark on the inside."

Marvin Segrest also testified that at one time he thought the girl was Lisa Wilber but was not "100% sure." When he watched the video of Lisa Wilber two years later, he decided it definitely was not she and remarked that the girl in the video had a distinctively large nose, a characteristic which he did not remember the girl at Sugar's having.

Defense counsel attempted to impeach Kirkendall and Segrest with prior inconsistent statements made to him and Fielder on October 13, 1985, when defense counsel first interviewed the three men. Kirkendall testified that he "just did not remember" what he told defense counsel and that he "wouldn't be surprised" if he had told defense counsel he was certain it *was* Lisa Wilber. Segrest testified he told defense counsel that it might have been Lisa Wilber but that he was not sure. Defense counsel took the stand, testifying that both Kirkendall and Segrest, as well as Fielder, stated that in November, 1983, they believed the girl at Sugar's *to be* Lisa Wilber; that is, stating in October, 1985 what their opinion

was in November, 1983. He also stated all three agreed to make a statement to that effect. Only Fielder actually made such a statement.

A trial court's ruling on a motion for new trial based on newly discovered evidence will not be disturbed on appeal absent clear abuse of discretion. *Eddlemon v. State,* 591 S.W.2d 847, 850 (Tex.Crim.App.1979). This discretion is not an absolute and unlimited power in the trial court, but rather power to make a determination in keeping with that which is just and equitable under all the facts and circumstances and subject to review by another court. *Henson v. State,* 150 Tex.Crim. 344, 200 S.W.2d 1007, 1013 (1946).

To establish that a trial court abused its discretion by not granting a new trial on the basis of newly discovered evidence, the record must reflect:

(1) The newly discovered evidence was unknown to the movant before trial,

(2) The movant's failure to discover the evidence was not due to his want of diligence,

(3) The materiality of the evidence is such as would probably bring about a different result in another trial, and

(4) The evidence is competent and not merely cumulative, corroborative, collateral, or impeaching.

*Carlisle v. State,* 549 S.W.2d 698 (Tex. Crim.App.1977). The record of the case before us clearly reflects that the first two requirements have been satisfied.

The fourth requirement is also clearly satisfied. Fielder was competent to testify, testifying from his personal knowledge. A central factual issue in the case was where Lisa Wilber went upon leaving Doc Holidays and with whom. Directly answering that question, the new evidence is not collateral, nor is it "merely ... impeaching." Although Fielder's testimony is cumulative and corroborative of Appellant's testimony, new evidence which is "only cumulative" may nevertheless warrant a new trial if it is cumulative or corroborative of defense witnesses who constitute interested parties. *See Id.* at 705; *Spencer v. State,* 69 Tex. Crim. 92, 153 S.W. 858 (1913). Appellant

was certainly an interested party in the proceeding.

In judging whether the materiality test has been met, both credibility and weight of the new evidence are proper considerations. *Jones v. State,* 711 S.W.2d 35, 37 n. 3 (Tex.Crim.App.1986). A trial court will not abuse its discretion in determining materiality if it determines (1) the new evidence is "not probably true" or (2) a different result will not probably be reached if the new testimony is produced upon another trial. *Bolden v. State,* 634 S.W.2d 710 (Tex.Crim.App.1982). Cases based on inconclusive circumstantial evidence deserve special consideration in this determination. *Jones,* 711 S.W.2d at 40.

The meaning of "probably true" has been explained as follows:

"All this really means is that *the whole record presents no good cause to doubt* the credibility of the witness whose testimony constitutes new evidence, 'either by reason of the facts proven at the trial or by the controverting affidavits on the motion, or otherwise....' *Arnold v. State,* 115 Tex.Cr.R. 189, 29 S.W.2d 762 (1930); *Griffin v. State,* 121 Tex.Cr.R. 604, 51 S.W.2d 593 (1932)."

*Jones,* 711 S.W.2d at 37 n. 4 (emphasis added). New evidence has been found not "probably true" when (1) opposed by affidavit or testimony at the hearing showing the new witness was not or could not have been in a position to know the material facts he purports to know, (2) the new witness is impeached at the hearing by a prior inconsistent statement, (3) the new evidence contradicts *either* the mass of reliable testimony elicited at trial, *or* almost conclusive physical circumstantial evidence developed at trial, *or* the defendant's own testimony at trial, and (4) the new testimony is internally inconsistent or otherwise inherently suspect. *Jones,* 711 S.W.2d at 37 n. 4.

The case before us falls into none of these categories. First, the testimony of the State's two rebuttal witnesses essentially corroborated that of the defense witness except on the issue of identity of the woman at Sugar's. Testimony of all three

witnesses reveals that the defense witness was in a better position to observe the woman than the rebuttal witnesses. The prior statements of the defense witness bolstered his testimony at the hearing. In fact, if anyone's testimony was impeached by prior inconsistent statements, it was that of the two rebuttal witnesses. Secondly, the evidence did not contradict testimony elicited at trial since no one saw Lisa Wilber leave the parking lot with Appellant. The State points out that the times attested to at the hearing were in conflict with those attested to at trial. Testimony concerning timing of the events of the evening, including when Lisa Wilber left the club, however, hardly constituted a "mass of reliable testimony." *See id.* The new evidence was in conformity with Appellant's testimony that he left Lisa Wilber in the parking lot of Doc Holidays. Moreover, not only was the physical circumstantial evidence, in the form of hair samples, far from conclusive, the new evidence is not necessarily inconsistent with it. Third, the State's allegations that the new testimony was internally inconsistent are without foundation in the record. The record further indicates that the defense witness is merely a disinterested member of the public who volunteered information on a matter within his personal knowledge for resolution of a publicly disputed issue and, thus, is far from "inherently suspect." Lastly, the rebuttal witnesses affirmed that Fielder was in a position to know the facts he purported to know.

Of course, that this case fails to fit into the list of examples is not dispositive, as the cases are founded upon a broader principle. If any fact in the record could have given the trial judge good cause to doubt Butch Fielder's credibility, then his denial of a new trial must be affirmed. We find no such basis for good cause to doubt the new witness' credibility.

Further, there can be no serious dispute that the result in this case would likely be different if the new evidence were admitted at another trial. The only circumstantial evidence affirmatively connecting Appellant with the crime charged was (1) his being the last person seen with the victim before her disappearance, (2) hair samples, which were far from conclusive, taken from Appellant's car, and (3) Appellant's familiarity with the area where the body was found. The new evidence directly attacks the assertion that Appellant was the last one seen with MS. Wilber and, if believed by the jury, could have injected a reasonable doubt into the case. *See Jones*, 711 S.W.2d at 40.

Moreover, that this case is based purely on inconclusive circumstantial evidence bears on the question of materiality. In *Jones*, the Court of Criminal Appeals discussed *Carlisle v. State*, 549 S.W.2d 698 (Tex.Crim.App.1977) a circumstantial evidence case remanded for new trial for newly discovered evidence:

"The State argued that the testimony of the new witness was merely cumulative of the defendant's own testimony that a third party was present in the car before the killing, and thus did not call for a new trial. Rejecting this, the Court held that the new testimony lent some credence to what was otherwise an inherently incredible account, and 'would certainly have affected [the jury's] deliberations and might possibly have resulted in a different verdict,' [*Carlisle*], at 705, *especially in view of the fact that the circumstantial evidence, while incriminating, was hardly conclusive. Apparently the Court found the new evidence at least creditable, if not 'probably true.'* See n. 4, *ante.* In effect the Court ruled that under the circumstances the new evidence, if believed by the jury, would have injected reasonable doubt into the case."

*Jones*, 711 S.W.2d at 40 (emphasis added). The court in this language not only noticed the increased likelihood of a different result at a new trial, but also implied a lesser standard of credibility in such cases. The emphasis of the application of this standard in inconclusive evidence cases seems to be on whether a different result will be had; likewise, a de-emphasis of the credibility factor occurs. The credibility component of materiality is, after all, merely a subset of the "different result" component, the

reasoning being, if the new testimony is for some discernable reason untrustworthy, the result is not likely to be different at a new trial.

Since this case is based on highly inconclusive circumstantial evidence, the likelihood of a different result at a new trial is great. The new evidence is also creditable; it is capable of belief. Thus, finding that the record demonstrates all requirements for a new trial have been shown, we hold that in not granting Appellant's motion for new trial, an abuse of discretion occurred. In *Spencer*, 153 S.W.2d at 860, the court wrote:

> "Courts are organized, and the object of the law is that the true facts may be arrived at and justice administered; and where the evidence is about upon an equipoise as to whether a man committed an offense or not, if there is really newly discovered testimony coming from a credible source, this rule [of the finality of trials] will be held in subordination to the great end to be obtained—that is, meting out justice to each individual citizen."

Appellant's third point of error is sustained.

Appellant's last ground of error addresses the constitutionality of *TEX.CODE CRIM.PROC.ANN. art. 37.07(4)* (Vernon Supp.1987) on grounds that it violates due process of law and the doctrine of separation of powers. But for the above disposition, a majority of this court would uphold the constitutionality of that statute with this author dissenting. *See Boudreaux v. State*, 723 S.W.2d 230 (Tex.App.—Beaumont 1986, no pet.) (Burgess, J., dissenting).

The judgment of the trial court is reversed and the cause remanded for new trial.

REVERSED AND REMANDED.

BROOKSHIRE, Justice, dissenting.

The majority has remanded the case because of the refusal of the trial court to grant a new trial to the Appellant based upon the discovery and proffering of allegedly newly discovered evidence. The record on the motion for new trial was carefully hammered out by opposing counsel. The main thrust of the Motion for New Trial, from the standpoint of the accused, is based upon the testimony of Franklin "Butch" Fielder, Jr.

Mr. Fielder testified that in November, 1983, he was working for a drilling company. He worked until about midnight, when the shift changed. On November 11, 1983, he got off around midnight. In his crew were David Kirkendall, Marvin Segrest and Mark Segrest. The record on the Motion for New Trial is consistent that the foreman and crewmen started having a few beers, maybe 3 or 4 per man, after they left the drilling site. They went to a nightclub in Beaumont called Sugar's. It was an after-hours club. It took about 30 minutes or a little more to drive from the drilling rig to Sugar's and this group stayed at Sugar's for about 45 minutes. The club closed at about 1:45 A.M. to 2:00 A.M. The crewmen had some more drinks at Sugar's and the basic thrust of Fielder's testimony is that he noticed a woman who came in Sugar's wearing blue jeans that he said, in his opinion, was Lisa Wilber. This young woman or "girl", after she entered Sugar's, went to the juke box and apparently changed the record. This, in turn, stopped another girl, who was on the stage dancing in what has been described as "black light." The girl who was already on the dancing stage when the juke box music was changed, stopped dancing and came down and talked to the girl who Fielder identified as Lisa. The dancer changed the music one more time. Then Fielder talked to the girl who came in after Fielder and his crew arrived, urging her to dance. By that time, the record showed that each of the crew had at least one additional drink each—maybe 2 or 3. Sugar's was described as a dark nightclub. The girl came in with 2 men but neither one of these men looked anything like the Appellant, according to Fielder.

After a short time passed, Fielder and his group encouraged or enticed the girl to

dance; that is, the girl that resembled Lisa. The girl who, in the opinion of Fielder, was Lisa danced close to closing time. In this type of club, the lights go on at closing time, being 2:00 A.M., but the bar clocks are usually set about 15 minutes early, making 1:45 A.M. the actual closing time.

A couple of days after this occurrence at Sugar's, Fielder read about a missing girl in the newspaper and viewed something about this missing girl on T.V. The newspapers and T.V. carried her picture. The missing girl was, of course, Lisa Wilber. Fielder's testimony, in capsule, concerning the identity of the missing girl, Lisa Wilber, being the girl he observed at Sugar's, was:

"A. It's her or I believe that was. You know the girl that I seen in the paper and the girl that I seen in the club that night were the same girl.

"Q. This girl you saw in the club close to closing time was Lisa Wilber.

"A. I believe it was."

At some point later in time, Fielder discussed this matter and the identification issue, he said, with Marvin and David. David asked Fielder if he had contacted the police but Fielder had not done so. Although Fielder was of the opinion the girl he saw at Sugar's was Lisa Wilber, and although he had formed his opinion about 2 or 3 days after Lisa's disappearance, he did not report the same to any official person until after the trial on the merits was had. Fielder then contacted Appellant's attorney. Fielder had mentioned that he had seen Lisa Wilber in the bar on the night of her disappearance to his wife but to no other person other than his crew. The record shows that the disappearance of Lisa occurred on or about November 11–12, 1983. However, Fielder did not contact the attorney for the Appellant until about November 14, 1985, about 2 years later.

On cross-examination, Fielder said that they arrived at Sugar's about 1:00 A.M. Fielder thought the girl resembling Lisa had had something to drink and she was feeling good. He could not remember what type of makeup she had on or what type of jewelry she was wearing. Fielder said that although, 3 days after the disappearance, he realized that the girl at Sugar's was, in his opinion, Lisa, he did not contact the police and he did not know about the $5,000. reward money. He said, generally, that he did not want to get involved at that time.

The next witness for Appellant was David Kirkendall. He testified that maybe the crew had had about 3 drinks per man at Sugar's. He said the girl in question was wearing denim jeans and when she later danced, she danced in her socks. She danced underneath the black lights. He remembered that this girl wore a distinctive top. This top had stripes across it and the black lights picked up those stripes. David said he had seen the pictures of Lisa in the paper and also some television coverage of Lisa Wilber. Later, he viewed a videotape of Lisa Wilber, taken when she was alive. He was with an Assistant District Attorney or an Investigator when he viewed the videotape. He was asked:

"Q. Can you tell me, do you feel like the girl you saw in that bar and the one you saw in that video and even on these pictures, do you feel like they are one and the same person?

"A. No, sir. I sure don't.

"Q. What differences do you note?

"A. Her hair was different. I judge height by my height. She was a little bit taller than me. That girl there, she looks, the one in the video looked probably my height and the other girl was a little bit taller than her."

It is true that some of the probative force of David's testimony was shaken, to a degree, by other questions. He testified, generally, that the black lights, the strobe lights and the flashing lights and surrounding atmosphere, in Sugar's, changed any person's looks a "bunch". He testified that Sugar's was very dark and had little light in it other than black light until closing time. David conceded that, back in November of 1983, he felt that the girl he saw in the bar and the girl whose picture he saw in the media as the missing Lisa Wilber were the same person, but that after he had seen the live videotape of Lisa

**114**

he definitely changed his mind. He said the videotape was a better picture. He had a chance to see the whole body of Lisa, clad, of course, in the videotape and he could see the size of her body and the size of her head. He acknowledged that the videotape, that was in the possession of the District Attorney's office, was the evidence that changed his mind. He seemed to remember that they were in Sugar's a minimum of 20 minutes when the white lights were turned on at closing time. The girl in question arrived after the crew did and the crew was in Sugar's about 15 minutes or something like that when they first noticed the girl in question. David characterized Mr. Fielder, whose nickname was "Butch", as being a kind of agitator. When asked what kind of personality Butch Fielder had "in these joints", he answered:

"A. Yes, sir. He has got a bad attitude. There is ladies in the courtroom, so I won't say what."

The next witness was Marvin Segrest. It would serve no useful purpose to extend this dissent. Marvin Segrest had also seen the video tape of Lisa Wilber, when she was alive, and he simply did not believe that the girl in Sugar's and Lisa were one and the same person. He testified that Lisa, in his opinion, had a "real large nose" and the girl in the afterhours club did not. Marvin acknowledged that Lisa and the girl in Sugar's looked similar and that there was a resemblance, but he made this answer:

"A. No, I don't believe she is the same one that was in the bar. To go even further the girl he showed me on the video had a real large nose. Her facial features just—they weren't the same you know to what I seen her on the video that Mr. Trahan showed to me.

"Q. Have you ever seen the picture of Lisa in the paper or one as big as that up close even?

"A. That is the first one I have seen that close up.

"Q. Does she have a rather large nose?

"A. She does have a large nose in my opinion.

"Q. The girl at the bar didn't?

"A. I don't think so, no, sir.

"Q. Not one that you would notice?

"A. No, sir, not one that I would notice like hers."

I think that the trial judge had not only the right, but the duty, to observe the mannerisms, demeanor, tenor, facial expressions and tone of the answers given by the witnesses. The different witnesses told different stories or accounts of what happened at Sugar's that night in relationship to whether the girl at Sugar's that danced the final dance was one and same as Lisa Wilber. Under ruling case law, I think that he had discretion; indeed, a good deal of discretion. He was in a superior position to judge the truthfulness, credibility, "believability" and the weight and force to be given to the testimony of the various witnesses on the Motion for New Trial. He decided adversely to Appellant. No abuse of his discretion is shown.

The district judge could have carefully considered and weighed the effects of the several beers and few drinks that each of the three witnesses consumed. As well, he could have considered the lack of adequate lighting conditions in the after-hours club known as Sugar's. He could have considered the distorting effect of the black lights or the strobe lights. He could have considered the inconsistencies in the evidence given by the witnesses on the Motion for New Trial.

Furthermore, he could have considered that, by logical reasoning, the girl who resembled Lisa arrived at Sugar's about 25 minutes, or maybe more, before actual closing time when the regular lights went on. Sugar's usually closed about a quarter before 2:00 A.M., or 1:45 A.M. He could have reasoned that the girl who arrived at Sugar's got there at about 1:00 o'clock A.M., or 1:10 A.M., or 1:15 A.M. Furthermore, there is evidence in the record that the authentic Lisa was actually seen on the parking lot of Doc Holiday's Club as late as 1:30 A.M. or later. By logical reasoning, the trial judge, under the entire record, could have concluded that Lisa was still at Doc Holiday's parking lot when the girl

that resembled Lisa arrived at Sugar's. Hence, the girl at Sugar's was not Lisa.

Furthermore, since Fielder admitted that he recognized the girl at Sugar's as being the same girl in the newspaper pictures and T.V. pictures 3 days after her disappearance, why did he wait until after the trial on the merits to come forward? The record shows that Lisa was missing the night of November 11–12, 1983. The case went to trial in November of 1985.

*TEX.CODE CRIM.PROC.ANN. art. 40.-03 (6)* (Vernon 1979) provides, in relevant part:

> "New trials, in cases of felony, shall be granted the defendant for the following causes, and for no other:
>
> . . . .
>
> "(6) Where new evidence material to the defendant has been discovered since the trial. A motion for a new trial on this ground shall be governed by the rules which regulate civil suits.... "

A leading case interpreting this statute is *Carlisle v. State,* 549 S.W.2d 698 (Tex. Crim.App.1977).

In *Carlisle,* the court wrote, at page 704:

> "The *trial court has considerable discretion* in granting or denying a new trial on the basis of newly-discovered evidence. To show that the court abused its discretion by not granting a new trial, the record must reflect: (1) that the evidence was unknown to the movant before trial; (2) that the failure to discover it was not due to appellant's want of diligence; (3) that its materiality was such as *would probably bring about a different result on another trial,* and (4) *that it was competent,* not merely cumulative, corroborative, collateral or impeaching. *Hernandez v. State,* 507 S.W. 2d 209 (Tex.Cr.App.1974); *Myers v. State,* 527 S.W.2d 307 (Tex.Cr.App. 1975)." (Emphasis added)

The trial judge could have decided that "(3)" and "(4)" had not been met, because he decided, basically, that the evidence and testimony on the hearing on the Motion for New Trial was not competent and would probably fail to bring about a different result upon another trial. *Carlisle, supra,* stands for the proposition that the trial judge has reasonably broad discretion in granting, or failing to grant, a new trial. I can certainly not say, under this record, that the trial judge abused his discretion in denying a new trial to the Appellant.

Query: If, ultimately, this case is retried and if another conviction is obtained by Texas against Appellant, then could yet another witness come forward two years after the retrial, with newly discovered evidence, and obtain another new trial? Query: How many times could this procedure take place?

Although *TEX.CODE CRIM.PROC. ANN. art. 40.03 (6)* (Vernon 1979) has been repealed (which repeal became effective on September 1, 1986); nevertheless, the material dates of this trial, the sentencing, the hearing on the motion and overruling of the same, were governed by *art. 40.03 (6).*

Furthermore, a trial court's ruling denying a motion for new trial will not be overturned upon an appeal unless a clear abuse of discretion is shown. *Eddlemon v. State,* 591 S.W.2d 847 (Tex.Crim.App.1979). In *Eddlemon,* the court wrote, at page 850:

> " ... [T]his Court again upheld the denial of a new trial on lack of probable truth where there were discrepancies in the new evidence and *circumstances which might cast a shadow on its veracity.* 'The probable *truth of the new evidence* is primarily *a determination for the trial judge.* Here, the judge saw the witnesses, observed their demeanor, and was required to determine the issue of their credibility.' Id. at 483. [*Williams v. State,* 504 S.W.2d 477 (Tex. Cr.App.1974) ] Where the truth of the new evidence is properly contested, as it is here, this Court should not second-guess the factfinder in the best position to decide the issue. Compare *Henson v. State,* 150 Tex.Cr.R. 344, 200 S.W.2d 1007 (1946) with *Williams v. State,* supra." (Emphasis added)

The majority addresses the constitutionality of *TEX.CODE CRIM.PROC.ANN. art. 37.07 (4)* (Vernon Supp.1987), dealing with the due process question and the doc-

**116**

trine of separation of powers. The author of the court's opinion states that this court would uphold the constitutionality of that statute with Justice Burgess dissenting. *See Boudreaux v. State,* 723 S.W.2d 230 (Tex.App.—Beaumont 1986, no pet.) (Burgess, J., dissenting).

It is important to note, I think, that, on the question of the separation or division of powers between the Legislature and the Judiciary, *TEX. CONST. art. V, sec. 31 (c)* provides as follows:

"(c) The legislature may delegate to the Supreme Court or Court of Criminal Appeals the power to promulgate such other rules as may be prescribed by law or this Constitution, *subject to such limitations and procedures as may be provided by law.*" (Emphasis added)

This constitutional provision, as I construe it, specifically reserves to the Legislature the right to require the trial judges to give the mandatory parole law instruction. Hence, it is not merely a legislative act. It is a legislative act that flows from a constitutional grant of power created by the people and given to the Legislature in the Constitution, itself. Hence, there is no merit in the contention that the parole law instruction violates the separation of powers doctrine as between the legislative branch and the judicial branch. *See Government Services Ins. Underwriters v. Jones,* 368 S.W.2d 560 (Tex.1963).

By similar reasoning and analysis, I think that there is no merit in the contention that the parole law instruction violates the separation of powers doctrine as between the legislative branch and the executive branch.

I would vote to affirm the judgment and sentence below.