**William Boyd BABINEAUX, Sr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–88–062 CR.**

Court of Appeals of Texas, Beaumont.

Aug. 30, 1989.

David B. Bonham, Beaumont, for appellant.

Bill A. Martin, Newton, for State.

OPINION

BROOKSHIRE, Justice.

The Newton County grand jury presented an indictment which alleged that the Appellant, on or about October 9, 1986, did then and there intentionally and knowingly cause the death of George Marcus Kerr by shooting him with a 12–gauge shotgun and did then and there use a deadly weapon.

The State's narrative of the events was that the Appellant had shot Kerr near a certain camp that was owned by the Appellant. The Appellant's estranged wife was residing in the camp. The deceased's corpse was located near the camp. A divorce was pending between the Appellant and his estranged wife. The Appellant relied, principally, on the defense of self-defense. The Appellant's recollection was that the divorce proceeding had been filed in July, 1986. According to the Appellant's own testimony, at one point, when the deceased was getting on his 3–wheeler, and shortly thereafter, when Kerr started to get off of it, Kerr started taking his long gun off the 3–wheeler and unwrapping it. At that point, Appellant testified that he told George Kerr to stop taking his gun off the 3–wheeler. The Appellant stated from the stand that he said, at the scene of the killing that there was no sense in anybody getting hurt. After this warning or admonition from the Appellant, the Appellant was asked by his own attorney if George Kerr said anything to the Appellant. The Appellant replied:

"A. He said "f—— you, scum."

The Appellant was asked what else did the deceased say and the Appellant said the deceased said:

"A. He said, I'll blow your f——— head off."

While uttering these profane statements, according to the Appellant, the deceased was in the process of getting his gun off the 3–wheeler. At that point, the Appellant, according to his own testimony, tried to influence and affect the deceased from taking the gun off the 3–wheeler and unwrapping the same by leading the deceased to believe there was someone else there

besides the Appellant. The Appellant stated that every time he looked out from around the tree, the deceased told him that he would blow the "f——— head" off the Appellant and that the deceased had his long gun pointed at the Appellant while he was shouting these vulgar statements.

According to the Appellant's own version of the attitude, demeanor, language and profanity of the dead man, it was amply demonstrated to the jury that the deceased, who was acting in a crazed manner—not only threatened the Appellant but cursed him as well.

The defense of self-defense, as well as the defense of accident, was submitted to the jury. The jury simply did not accept the Appellant's version or narration of events leading to the death of Kerr.

Apparently, shortly after the shooting, the Appellant was walking down River Road and was walking past the yard or front door of one John Cofty, when, according to Cofty, this exchange took place:

"A. Well, to the best of my knowledge, the best I can remember, he walked up in the yard—I stepped out—and he asked me if I heard the shots. And I said, well, I've heard some shots. And he said I just shot the bastard that's been living with Betty down there.

"Q. Then how did he seem? Did he seem relaxed or excited or what could you tell?

"A. Kind of shook-up, I guess."

Later, the witness, Cofty, stated that the Appellant told him that he didn't want what happened to have happened; that all he wanted to do was to get a picture and that he, the Appellant, hated what had happened; that his own people were really good people and that the law had already been notified.

A deputy sheriff, Butch Bryant, testified that apparently Mr. Babineaux was standing behind a certain tree when the shooting took place and that is where he found two shells or two hulls on the ground and, further, the deputy sheriff, Bryant, claimed Mr. Babineaux showed him where Babineaux was standing behind the tree. When the deputy arrived at the scene, the 3–wheeler was still running and the victim was lying on the ground. The deputy sheriff said the very first thing the Appellant said, when the deputy sheriff came up was:

"A. ... He said I shot the bastard.

"Q. Was he sad about it or crying or anything like that?

"A. No, sir. I couldn't say whether it was a type of mood that is out of anger or sorrow—more of a hateful attitude."

The deputy did see one man walking around who had a camera around his neck and Appellant identified that man as being one of his sons. The deputy said later the Appellant told him that he shot George Kerr because he thought George was going to shoot him. Somewhat later, the Appellant had told the deputy sheriff that he had gotten a phone call from his lawyer in Port Arthur. Appellant had heard that George, or somebody, had been staying at his wife's camp-house and his lawyer told him he should get some photographs and if he obtained some photographs these would help him work his divorce case out.

The clothing that the deceased had on, at the time of alleged crime and at the crime scene, were offered into evidence as State's Exhibit No. 28. The Appellant had no objection to these clothes except that he wanted the State to enumerate each article of clothing. The articles were a pair of pants that the victim had on, which were military style; a blue jacket that the victim had on; a pair of shoes and two pair of socks that he had on; and a necklace, a gold-chain necklace. He had on some blue jeans, an undershirt and a belt. There was also a black tee shirt and other small articles of clothing. The above test was from the testimony of Officer Bryant.

There was also a shotgun beside the body of the dead man and it was shown that the safety on the long gun was off and it was in a ready-to-fire position. The long-barreled gun beside the body of George Kerr was loaded when found by Bryant. The load was .00 buckshot. Upon cross-examination, Bryant insisted that there had been several stories, or three different sto-

ries, or versions of the tragic events that the Appellant had told Bryant and Bryant maintained that the Appellant first told him that the Appellant wanted to talk to George Kerr, but he was afraid George would shoot him because George hollered once that he, the victim, would blow Mr. Babineaux's m——— f——— head off and that the then suspect, now the Appellant, was standing behind a tree and said that the victim turned around and faced the Appellant directly and raised his shotgun and the Appellant just stuck his gun around the tree and fired twice. That was the first story.

Then, Bryant said his recollection was that the victim had just gotten off the 3–wheeler and had taken off running. Then, when Bryant asked the suspect, Babineaux, Sr., how the victim got off the 3–wheeler Bryant said Babineaux made the comment that he first saw the victim coming down the trail, riding it apparently after he had left the wife's camp and then he, the suspect, hollered for Kerr to stop and he wanted to talk but the victim jumped off the 3–wheeler and started running on foot. Bryant then stated that, from the indications at the scene, when he looked at the position of the 3–wheeler and the dead body, Bryant thought that Kerr was running away from Babineaux, Sr. The distance from the 3–wheeler to the body was 36 feet.

Upon further cross-examination Bryant said he went to the funeral home and talked with Paul Smith and Walter Smith, the owners. There was turned over to him, in addition to the clothing, a clear plastic bag filled with a green leafy substance. Bryant could not recall what happened to this green leafy bag and he didn't know what he did with it; but he didn't think he placed it in the evidence locker.

The plastic bag was never produced, which gives rise to the first ground of error. However, Mr. Don Moye, who was co-counsel with Mr. Bonham for Babineaux, Sr. was inspecting the clothes and the blue jacket and discovered, in one of the pockets, a substance that appeared to be marihuana. Bryant testified that, ulti-mately, the substance in the blue jacket of the dead man was actually marihuana; that it had been sent to the D.P.S. lab in Austin. This testimony was elicited from Bryant outside the presence of the jury.

The court would not permit the information about the marihuana in the pockets to go to the jury on the theory that this did not tend to show violence on the part of Kerr. The defenses argued to the contrary.

Bryant further testified that he had considerable experience in shooting guns and in shooting guns with buckshot. He said, unless a person was an expert shot or trick shot, there was no way if a person standing behind any type of object holding a shotgun loaded with this type of shells, a person could shoot it and pump the gun again and shoot accurately at the same spot or target and such maneuver certainly could not be done with fast motions. The deputy testified that it was 84 feet from the tree, behind which Babineaux said he was standing, to the deceased's corpse and that he, Bryant, tried to aim and take his time to shoot at a poster board, that he had to take aim in order to shoot and he had to take time in order to shoot at an object or poster board 84 feet away. He testified that, holding the gun out, he could not have hit the poster board when he shot.

In summary, he was asked:

"Q. And have a tree in front of you and you reaching around the tree where you couldn't see, even see the object. Do you think you could have hit it that way?

"A. No, sir."

There was a large pine tree a certain distance from the deceased's corpse and the deputy sheriff testified that if you extended the line from the 3–wheeler, whether the deceased was walking, running, backing or moving, then, if he had kept moving in the same direction, the deceased would have gotten behind the big pine tree.

Kenneth Ray was called to the stand by the State. He was the Chief Deputy in the Sheriff's Office of Newton County. He was the first uniformed officer at the scene. Kenneth Ray said that, as he got to

the scene, Mr. Babineaux, Sr., walked up and told the uniformed officer that he was the one that shot Kerr and that he "shot the bastard. That's a quote."

He gauged Mr. Babineaux's demeanor as not being sorrowful or remorseful. Ray said Babineaux, Sr. was almost bragging. He did not hear the Appellant state that he, the Appellant, was being threatened at the time Kerr was shot. Uniformed officer Kay said that the front of the 3–wheeler was headed towards the body and the 3–wheeler was stopped away from the body but the 3–wheeler was still running.

The next witness was the Sheriff of Newton County, Robert Woods. He accompanied the body to the funeral home. The sheriff made arrangements for a pathologist and he followed the body to the pathologist in Lufkin.

Bryant was finally permitted by the trial court to testify before the jury that he shot the shotgun into a cardboard box and a poster, from 84 feet, and he could not have hit the pieces of paper without aiming the gun and he could not have done it when he was hiding or standing behind an object and unable to see the target. The targets were State's Exhibits 45, 46 and 47, which were admitted into evidence.

This witness also testified that he could find no evidence that George Kerr's gun had been fired at the scene.

The next witness called by the State was Dr. James Bruce. He is a pathologist, residing in Lufkin. On external examination, he found 18 entrance wounds. The pathologist testified that there was a wound to the lateral aspect to the left arm, about 5 inches above the left wrist. There was one on the lateral aspect of the left elbow and one on the posterior left arm, or back side of the left arm, 4 inches above the elbow. These were on the bottom side of the arm and the path of these were to the right and slightly upward.

The pathologist further testified that another set of pellets came from the right side and through the arm. Some went in the side of the abdomen and proceeded upward and some went in the leg and these

pellets were definitely going up. Then he was asked:

"Q. How would someone have to be in order to have projectiles going up in their body that way?

"A. Either the gun would have to be pointing upward from the ground or the person who's being shot falling or lying back.

"Q. Falling or lying back. Let me get to that with you for a moment. It's true, is it not, the human body is hinged to fall forward; isn't it?

"A. Generally, yes."

The doctor said the projectiles, or pellets, caused significant injury to the blood vessels of the chest and heart with subsequent extensive loss of blood, which was the cause of death, in his opinion. The doctor opined that the left-side entrance shots occurred first and then the buckshot that went in an upward direction would more likely have been the second shot.

Kenneth Ray was recalled to the stand. When the Appellant was on the stand, he testified that one or more of the investigating officers had told him not to worry, since it looked like a matter of self-defense. The State recalled Ray and also Butch Bryant and they, unequivocally, denied that they had spoken words to that effect to Appellant.

Ernie Kerr, the father of the dead man, was called to the stand and the following exchange between Mr. Charles Mitchell, State's attorney, and Mr. Ernie Kerr took place:

"Q. Do you recall at some point in time having a conversation with Mr. Babineaux concerning his estranged wife?

"A. Yes, sir.

"Q. Did you know her, also?

"A. Oh, yeah, yes, sir.

"Q. And did he express at that time some statement as to what he would do if she ever ran off with another man or he ever suspected that was going on?

"A. Yeah, or being around her.

"Q. And to the best of your recollection, what did he say he would do in such situation as that?

"A. He said he would kill any son of a bitch he ever caught with her. Make the statement, if I may. I said, well, you may have a lot of people to kill because that woman was not all that old, and you may have to kill a lot of people. He said, I'll damn sure do it."

Later, Mr. Kerr said that Mr. Babineaux had been in the front room of Mr. Kerr's home and had told Kerr that, as long as Babineaux was alive, there would be nothing that would happen to his son.·

From one of the sons of the Appellant, there was a version of the narrative of the tragic events. For the picture taking purpose, there existed no necessity for the Appellant to be at the scene of the campsite. The two young men, Appellant's sons, could arrange to take the pictures of George Marcus Kerr leaving the campsite. One of the sons had contacted, by telephone, a Mrs. Milligan, who, in turn, was to call Mrs. Betty Babineaux, the wife of the Appellant and the mother of the two sons to tell her that they, the sons, were on the way, which was part of a plan to induce the exiting of the dead man from the camp and thereby take pictures of him while he was exiting the camp. The purpose of this plan was to expedite a divorce settlement.

Concededly, the testimony is certainly not all harmonious. There is some conflicting testimony, but it is evident that the jury accepted the State's theory and version of the tragic events.

■ Appellant's Point of Error No. 1 states that fundamental error occurred when the State failed to produce certain exculpatory evidence. This referred to the fact that plastic bag, containing a green leafy substance, was not produced for discovery or at trial. The Appellant contended that the same was marihuana; but the same had not been tested. There was one officer that said he had picked the plastic bag up at the funeral home and had put it in the evidence vault or property vault. He candidly admitted that he had destroyed it

because, in his opinion, it was nothing. The record fails to reflect that the Appellant proved, or offered to prove, that the deceased had actually used this green leafy substance, whether it was marihuana or not, and, further, the Appellant failed to prove, offer or tend to prove that the use of marihuana would create a state of mind in the deceased that would make the defense of self-defense for the Appellant more credible, as was contended by the Appellant. In this context, the contention was made to the trial court that the Appellant's constitutional right—unspecified— had been violated and that there had been a violation of the Texas Code of Criminal Procedure, as to this Appellant—again unspecified.

We think a careful review and analysis of the entire record and especially the testimony of the Appellant, himself, on the actions and appearances and the vulgar words used by the dead man, or allegedly used by the dead man, certainly set before the jury fully, and, indeed, repeatedly, in the most purple and profane type of language, the Appellant's contention concerning the state of mind of the deceased at the time this tragic killing took place. Under this record, we do not see how the existence of the plastic bag, with the green leafy substance—and nothing more—would have enhanced the force or the credibility or the persuasiveness of the Appellant's contention of self-defense. Again, it was not shown that the deceased had used or smoked the green leafy substance, even if it was marihuana. Nor was it shown that this would create a state of mind in the deceased wherein he would be more prone or compelled to attempt to kill Babineaux, Sr.

We think the record is undisputed that the long gun near the body of George Kerr was not fired and that it fell in a position where the muzzle, or end of the barrel, had fallen first into the dirt. The dirt was in the barrel at the time of trial, which, at least according to the State, tended to show that the gun was not raised in a shooting or threatening position as against Babineaux. Furthermore, we think the record

clearly shows that two .00 buckshots were fired by the Appellant at least generally in the direction of Kerr and that this, according to the record, would propel and discharge twenty-four .00 BBs or small projectiles and that 18 of these were discovered in the body of the dead man, or about 18. However, there was no mark or .00 shotgun pellets or BBs that lodged in or struck the long gun of Kerr. Hence, it was certainly the State's theory, which they argued vehemently, and which apparently the jury accepted, that Kerr's long gun was away from the side of the body of Kerr that received the entering wounds. Hence, the long gun was not pointed towards Babineaux, Sr.

Under this entire record, we conclude that the Appellant has failed to show that there has been a constitutional violation and has failed to show the necessary materialty of the plastic bag with the green leafy substance. *See United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Stone v. State,* 583 S.W.2d 410 (Tex.Crim.App.1979). In *Stone, supra,* the Court of Criminal Appeals, following *United States v. Agurs,* quoted from *Agurs,* at page 415, as follows:

"... unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose.

" * * *

"The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."

The Court of Criminal Appeals wrote that, in determining and evaluating materialty, the omission must be evaluated *in the context of the entire record and that constitutional error is committed only* "if the omitted evidence creates a reasonable doubt that did not otherwise exist."

Our Court has reached and dealt with a similar situation and issue in *Randall*

*Dean Long vs. State,* 739 S.W.2d 98 (Tex. App.—Beaumont 1987, one pet. granted, one pet. ref'd). Long in his first point of error claimed that he was denied due process of law and also his right to cross-examination by the trial court's refusal to exclude certain testimony proffered by the State on microscopic hair comparisons after the State had, in effect, violated the court's order to provide the hair samples to the defense for its own comparison and testing. The trial court had granted such a motion which the State did not actually oppose. The State's counsel pointed out that the time and the place for the inspection would be subject to the *State receiving the items to be received back from the Washington, D.C., F.B.I. laboratory. But the requested hair was not produced.* The State's investigator had sent six hairs considered by the State's expert to be microscopically similar to a second testing. The second testing was done by a Texas A & M University expert on neutron activation analysis. These neutron activation tests made further microscopic analysis of the hairs impossible. The accused Long vehemently argued for the exclusion of this relevant evidence because of a violation of a discovery order and the destruction of the hairs. Even though the hairs were not available to Long for examination our Court held that this situation did not create error absent a showing of affirmative bad faith on the part of the State. We overrule Appellant's Point of Error No. One.

■ The Appellant's second and third Points of Error aver that the trial court erred in excluding evidence that the deceased was in possession of marihuana at the time of the offense and, further, that the trial court erred in excluding evidence that the deceased was under the influence of marihuana at the time of the offense. The evidence before us is devoid of any suggestion that the use, smoking or ingestion of marihuana into an individual person's system makes that person violent and aggressive.

The Appellant's testimony describing Kerr did not indicate that the victim's speech was slurred or, somehow, out of

control or staggering. Indeed, according to the Appellant, the speech of the deceased was loud, vociferous, clear and vulgar. The deceased's movements and actions, according to the Appellant, indicated that Kerr was about to shoot the Appellant. The jury, upon observing the witnesses and weighing the evidence, did not follow this contention to the defense. The very thrust of the Appellant's testimony was that the victim was angry and determined to harm Appellant, that Kerr's weapon was actually leveled and pointed at the Appellant in a steady, intended plan and calculated position to threaten or to take the Appellant's life. Appellant said the deceased had experience and skill as a rifleman or marksman and as a long-time hunter.

The Appellant said that he had an occasion to observe Kerr, from the time he emerged from the campsite and for some period of time. There was no mention of the dead man smoking anything, either a regular tobacco cigarette or anything else. There was no testimony that anyone discovered a partially smoked marihuana cigarette, or marihuana cigarettes, anywhere near the body of the deceased, although the record shows that the surrounding area was carefully viewed and searched by more than one person. It is a logical conclusion that the only person who was with Kerr, or saw Kerr, or observed him from the time the telephone call was received from Mrs. Milligan, and the lights came on in the camp was reasonably the wife of the Appellant, one Betty Babineaux. The State could not call upon her to testify. The defense did not.

Moreover, on the theory that the marihuana made the deceased hostile, aggressive and determined to harm the Appellant, it should be noted that the physical evidence showed that the dead man's body was lying with his head away from the Appellant and his feet towards the Appellant. The pathologist, Dr. James Bruce's, testimony was that a human body is hinged to fall forward and will do so when shot and that the human body is so constructed or hinged that it will fall forward or fall in the direction in which it was going when shot, thus tending to demonstrate that the deceased was headed away from the Appellant at the time he was shot.

Furthermore, there is evidence of probative force that there was a certain amount of dirt crammed in the barrel of the deceased's weapon, tending to show, for the jury's consideration and for their weighing, that at the time the dead man fell when he was shot, that his weapon was pointed downward rather than upward or at a level towards the Appellant. The record discloses that the Appellant's shots hit the victim and that 18 pellets or .00 shotgun BBs, out of a possible 24 buckshot pellets, or .00 pellets, contained in the two rounds or hulls shot at a distance of 84 feet, tended to show, for the jury to weigh, the Appellant was taking steady aim rather than just randomly firing in the victim's direction.

Significantly, we think, there were no .00 shotgun pellets that embedded themselves or scarred or marred the deceased's weapon. Therefore, it could be argued Kerr's weapon was on the non-exposed side of the deceased, thereby showing that the deceased's weapon, a long gun, was not aimed at the Appellant. *TEX.R.CRIM. EVID. 403* provides, in relevant part, that:

"... [E]vidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...."

On consideration of the elements of Rule 403 such as unfair prejudices, or confusion of the issues, or misleading the jury, we think the trial judge has reasonable, judicial discretion in making his rulings as to admissibility. We find no abuse of discretion in disallowing the evidence of the marihuana particles in the victim's blue jacket.

The last point of error advances that, in the State's argument, on guilt or innocent, the prosecutor improperly referred to the absence of the testimony of the wife of the Appellant. The jury was properly instructed. There was no motion for a mistrial made and, of course, the grounds raised on appeal must comport to, and be harmonious

with, the objection made at trial. The alleged error must be properly preserved.

██ But there is yet another consideration. The alleged offense of murder herein occurred on October 9, 1986. The relevant Texas Rules of Criminal Evidence came into effect on September 1, 1986. *TEX.R. CRIM.EVID. 504(2)(a)*, provides, in relevant part, as follows:

"(2) *Privilege not to be called as a witness against spouse.*

(a) *General rule of privilege.* The spouse of the accused has a privilege not to be called as a witness for the state. This rule does not prohibit the spouse from testifying voluntarily for the state, even over objection by the accused. A spouse who testifies on behalf of an accused is subject to cross-examination as provided in Rule 610(b). Failure by an accused to call his spouse as a witness, where other evidence indicates that the spouse could testify to relevant matters, is a proper subject of comment by counsel."

When the State argued that Mrs. Babineaux, who was still married to the Appellant, was not called as witness, there was no objection made by the Appellant. We opine that *Rule 504(2)(a)* made the prosecutor's argument both permissible and correct under the record in this case.

The original color photographs were requested by us because the photostatic copies thereof as exhibits in the file were not clear. We have carefully examined among others approximately 37 photographs in color that were State's exhibits; 14 color photographs that were Defendant's exhibits. We conclude that some of these photographs would sustain the State's theory of the case that some of the .00 buckshot entered the body of the dead man after he was prone on the ground or nearly prone. Some of the pictures taken at autopsy demonstrate that some of the pellets had upward movement in the leg or groin area and side area of the victim. From other pictures it is shown that the dead man's long gun was not damaged by the .00 buckshot which, subject to the jury's weighing

of the same and the jury's prerogative tended to show that Kerr's long gun was not pointed at the Appellant but the long gun was on the side of the dead man which was away from Babineaux when Babineaux discharged the two cartridges of .00 buckshot.

We overrule each and everyone of the Appellant's points of error. We affirm the judgment and sentence below.

AFFIRMED.